NATIONAL BROADCASTING
COMPANY, INC., Plaintiff,

v.

Jonathan SONNEBORN, Individually and doing business as Reel Images and doing business as Video Images; Cleo Sonneborn; and Reel Images, Incorporated, Defendants.

Civ. No. B–80–189.

United States District Court,
D. Connecticut.

Nov. 15, 1985.

526

Morgan P. Ames, Mark E. Fuhrmann, Cummings & Lockwood, Stamford, Conn., David R. Hyde, Lisa Schilit Pearson, Frank T. Judge, III, Cahill Gordon & Reindel, New York City, for plaintiff.

William F. Dudine, Jr., Terry J. Ilardi, Darby & Darby, P.C., New York City, for defendants.

## MEMORANDUM OF DECISION

MESKILL, Circuit Judge, Sitting by Designation.

Plaintiff National Broadcasting Company (NBC) brings claims of copyright infringement under 17 U.S.C. § 101 *et seq.* (1982) (Copyright Act of 1976), and for unfair competition under 15 U.S.C. § 1051 *et seq.* (1982) (Lanham Act) and state law. This Court has jurisdiction of the copyright and Lanham Act claims under 28 U.S.C. §§ 1331 and 1338 (1982). Jurisdiction of the state law claim for unfair competition is found under 28 U.S.C. § 1332 (1982) (NBC is a Delaware corporation with its principal place of business in New York, New York; Sonneborn is a Connecticut domiciliary; the corporate Defendant Reel Images, Inc. is a Connecticut corporation with its principal place of business in Sandy Hook, Connecticut; the amount in controversy exceeds $10,000). Jurisdiction of the

state law claim is also predicated on 28 U.S.C. § 1338(b) (1982).

## BACKGROUND

The events that form the subject matter of this case hearken back to the dawn of videotape technology, to an era before videotape players became a common household appliance. This case demonstrates how technology has made some traditional categories of copyright law anachronistic. It also demonstrates that occasionally it is still necessary to apply those categories to cases brought under the new copyright laws, laws that were designed to rehabilitate those time-worn categories.

*The 1960 Broadcast of "Peter Pan"*

On December 8, 1960, NBC broadcast a color videotape recording of "Peter Pan." The recording had been made at various locations in New York City during the autumn of 1960. Transcript of Preliminary Injunction Hearing at 69–70. At that time the words "television network" did not have the functional content that they do today; in "single-station markets" a local television station might be affiliated with several national networks. Tr. 2–12 to 2–13, 2–50. The networks would compete with each other for the opportunity to have their programs broadcast in these markets and would make their programs available to their affiliates for delayed broadcast where the affiliate had already scheduled a different program for the time slot chosen by the network. *Id.* Five NBC affiliates chose not to carry "Peter Pan" on December 8, when it was transmitted from NBC. Tr. 2–50. NBC created for each of them what in technical parlance is called a "kinescope" or "kini." Tr. 134. *See* Tr. 83–88, 2–60, Pl.Ex. 120.

A kinescope was a film recording of a kinescope tube, which could be made while the television broadcast was being aired. Tr. 126–27, Tr. 83–87. Kinescopes were used to make delayed broadcast possible until the mid-1960s; they were then replaced by videotapes. Tr. 126; 2–13, 2–60, 2–62. Most NBC affiliates did not have videotape equipment in 1960 however. *Id.*

Kinescopes were generally in black and white rather than color format. Tr. 2–15. They could be created "off-the-air" but the quality of this type of kinescope was poor. Tr. 111–12, 2–14 to 2–15. Kinescopes were made as "off-air tests" by a few small companies without NBC's knowledge, Tr. 127, possibly for use by advertisers who wished to verify that their commercials were aired. Copying a kinescope was quite expensive at the time in question even though it was technologically possible to prepare a "dupe" (duplicate) of a kinescope by sending it out to a specialized film laboratory. Tr. 2–63 to 2–64. The graphic resolution of kinescopes was generally poor because first a negative of the transmission was made and then a positive print was made from the negative. Tr. 86–87, 111–12.

After the kinescopes were prepared they were delivered to the affiliates. Tr. 134. NBC included this language in the standard form of its affiliation agreement:

> You [the affiliate] agree that you will not authorize, cause, permit or enable anything to be done without NBC's consent whereby any television program, motion picture film, recording or other material furnished to you hereunder may be recorded, duplicated, or otherwise used for any other purpose other than broadcasting by the Station as provided herein.

Pl.Ex. 125, ¶ 19. NBC is now unable to establish conclusively that all of the kinescopes were returned to it after the delayed broadcast, but it had a policy of requiring the affiliate to return the film. Tr. 129–31, 137. Pl.Ex. 125 ¶ 3. When affiliates did not return films NBC had a policy of contacting its regional representative to induce the tardy affiliates to return their prints and to "abide by the [affiliation] contract." Tr. 2–44. After it had kept the returned film for a period of time NBC would then destroy it, Tr. 137, or salvage it for reusable photographic compounds. Tr. 2–44.

NBC had previously made two television broadcasts of "Peter Pan." These oc-

curred under a contract between Walt Disney Productions (not a party to this suit), the holder of the television broadcast rights during the time of the prior telecasts, and NBC. *See* Pl.Ex. 8. NBC broadcast in color performances of the Broadway musical "Peter Pan" on March 7, 1955 and January 9, 1956. Pl.Ex. 29 & 30. It later extended its license to televise "Peter Pan" by negotiating a contract with the Hospital for Sick Children which held the rights to Sir James 'Barrie's "Peter Pan." Pl.Ex. 12–28. Then it negotiated a series of contracts with various performers and artists connected with the original Broadway production. Pl.Ex. 33–78. Some of these contracts reserved ownership of resulting property to NBC, *see, e.g.,* Pl.Ex. 67 ¶ 12, and some only granted NBC a license to broadcast the resulting performance a specified number of times. *See, e.g.,* Pl.Ex. 49 ¶¶ 1, 12. Its contract with Mary Martin, "Peter Pan's" star, provided that if a kinescope were made of the program she would receive a copy "for her personal and private library purposes only." Pl.Ex. 65 ¶ 17.

*International Broadcast Licensing and Domestic Donation of "Peter Pan"*

Between 1963 and 1968 an NBC subsidiary, NBC International Ltd. (NBCI), granted licenses to broadcasters in five foreign countries to telecast the 1960 production of "Peter Pan." Pl.Ex. 92–112. The licenses granted the right to broadcast "Peter Pan" in specific locations for specific amounts of time. *See, e.g.,* Pl.Ex. 103 (Sales Report). The photostatic copies of two of the licensing agreements included in the record are virtually illegible, but the third contains a provision prohibiting the licensee from copying or duplicating the film. Pl.Ex. 111 ¶ 13.

Some time in 1964 NBCI prepared several "audition" prints to use in connection with its efforts to promote licensing agreements in Europe. Tr. 71. The audition prints were identical to the 1960 telecast of "Peter Pan" except that they were kinescopes, were black and white and were not of broadcast quality. Tr. 72–74, 80. After an audition print was mailed to the potential licensee, an NBCI salesperson would visit the potential licensee to arrange the sale and return of the audition print. Tr. 71–72. The former head of NBCI answered "no" when asked "[H]as it ever come to your attention that any foreign broadcaster who is licensed to broadcast "Peter Pan," or who received a copy for audition purposes, used that copy or disposed of that copy in a manner which was inconsistent with its contractual obligations or with industry custom?" Tr. 55–56, 76.

Under a November 1976 agreement, NBC donated a print of "Peter Pan" to the Museum of Broadcasting (MOB). Pl.Ex. 124, items 25, 28. The donation agreement provides that MOB may make copies of the print "for any purpose specified" in the agreement. Pl.Ex. 123 ¶ 3. MOB received title to the physical print but not "any title to, or artistic or literary rights in" the film. *Id.* at ¶ 4. MOB may allow scholars and researchers to view the print. *Id.* at ¶ 5. It may put on public performances of the print provided that it not be put to commercial use, *id.* at ¶ 8, and subject to the approval of the parties who own rights in the underlying work. *Id.* at ¶ 5(b), (c).

In 1980 NBC licensed some of its programs to the RCA videodisc enterprise. Tr. 106–07. NBC screened "Peter Pan" for RCA representatives and prepared a cassette at the screening. Def. Ex. 501 (Oct. 23 & 29, 1979). "Peter Pan" could not be licensed to RCA because NBC's contractual right to license the show had expired. Tr. 107. Another reason for the failure was that NBC never had the contractual right to sell tangible copies of "Peter Pan." Tr. 117. NBC and the Hospital for Sick Children conducted preliminary negotiations on the subject but no licensing agreement was ever reached. Def. Ex. 501 (Mar. 24, 1980).

*Sonneborn's Copying*

Jonathan Sonneborn is the president of Defendant Reel Images.[1] Tr. 3–8 to 3–9.

---

1. Defendant Cleo Sonneborn was dismissed from this suit by consent of the parties and the Court. Tr. 34–36.

Reel Images sells reprints of audiovisual works that are in the public domain and that are under license to it. Tr. 3–11, 3–14 to 3–15. Reel Images promotes its product in catalogs and flyers. *See, e.g.,* Pl. Ex. 88; Tr. 3–12 to 3–23. In late 1979 Sonneborn spoke to a person from the East Brunswick, New Jersey library; that person told him that the library had a kinescope of "Peter Pan." Tr. 3–41.

Sonneborn offered to repair the library's damaged copy of the "Peter Pan" kinescope in return for the right to duplicate and sell videotape cassettes of the kinescope. Tr. 3–44 to 3–45. Sonneborn consulted two copyright registration books from the Library of Congress and a work called *Film Superlist* in an attempt to learn if NBC's "Peter Pan" was under copyright and found no listing; Tr. 3–45 to 3–46; he also contacted the Library of Congress to learn if there had been a copyright registration filed with it. Tr. 3–47 to 3–50. When the East Brunswick library sent Sonneborn the kinescope, he examined the "head" and "rear credit" for a copyright notice. Tr. 3–47. This examination and the inquiry to the Library of Congress failed to disclose a copyright registration. *Id.* at 3–47, 3–49 to 3–50. Sonneborn featured the cassette copies of "Peter Pan" in his Spring 1980 catalog. Pl. Ex. 88. The parties do not dispute that the cassettes are copies of a kinescope of the original 1960 broadcast of "Peter Pan;" the logo of NBC is clearly visible in the head and tail credits of the videotape. In March 1980 NBC applied for a copyright registration for "Peter Pan." Pl. Ex. 1. NBC filed this action in April 1980 and Chief Judge Daly granted it a temporary order restraining Defendant from further sales of the "Peter Pan" cassette. On July 24, 1980 Chief Judge Daly granted NBC a preliminary injunction. NBC later unsuccessfully moved for summary judgment before Magistrate Smith; Chief Judge Daly approved that determination and ordered the parties

to prepare for trial. The case was tried to the Court June 25–27, 1985.

## DISCUSSION

### A. *Copyright Infringement*

NBC's cause of action for infringement arises under 17 U.S.C. § 501 (1982).

To succeed, NBC must prove that it is a copyright owner and that Sonneborn violated one of the exclusive rights under 17 U.S.C. sections 106–118. 17 U.S.C. § 501(a). *See also Eckes v. Card Prices Update,* 736 F.2d 859, 861 (2d Cir.1984) ("In order to prove copyright infringement, [plaintiff] 'must show ownership of a valid copyright and copying by the defendant.'") (quoting *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 (2d Cir.1977)). It is conceded that Sonneborn copied a kinescope of the 1960 telecast of "Peter Pan." Tr. 2–82 to 2–83.[2] Section 106(1) of 17 U.S.C. (1982) provides that an exclusive right of the copyright owner is "to reproduce the copyrighted work in copies," so NBC will succeed on its infringement claim if it is a "copyright owner." Section 411(a) requires NBC to register its copyright in order to maintain an infringement action. *See* Pl.Ex. 1. Section 412 requires this registration in order to receive certain relief. Section 410(c) states that a certificate of registration "shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." *See also Eckes,* 736 F.2d at 861.

Sonneborn attacks the operation of this presumption on three grounds: (1) NBC's certificate is defective because it contains errors; (2) NBC's certificate is not valid because NBC did not create a derivative work and did not own any copyrightable material in the 1960 videotape; and (3) NBC's certificate is not valid because it "published" "Peter Pan" more than five

---

**2.** There is a minor dispute as to whether the opening and closing credits in Sonneborn's videotape cassette are copies of the opening and closing credits in the registered videotape, Tr. 2–78 to 2–84. A resolution of this dispute would not affect the outcome here.

years before registration and therefore cannot be protected by copyright under 17 U.S.C. § 410(c) (1982).

### 1. *Errors in the Certificate of Copyright Registration*

Sonneborn claims that NBC's certificate is not valid because of four errors. He claims that NBC erroneously stated in its certificate that "Peter Pan" was first broadcast on December 8, 1960; that it was the author of the "entire work;" that "Peter Pan" was a "work for hire;" and that "Peter Pan" was unpublished. Sonneborn would defeat NBC's presumably valid certificate of registration if he proved that NBC's errors and omissions were the " 'knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application.' " *Eckes*, 736 F.2d at 861 (quoting *Russ Berrie & Co. v. Jerry Elsner Co.*, 482 F.Supp. 980, 988 (S.D.N.Y.1980); citing *Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 412 (2d Cir.1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971)).

 Sonneborn clearly failed to carry that burden here. He made no showing that NBC had any fraudulent purpose in making any of the statements on the certificate. The Court will not presume a fraudulent purpose merely because the registration was made with a view toward pending litigation. *See* 17 U.S.C. § 410(c).

 Notwithstanding Sonneborn's failure to prove "a knowing failure to advise" on NBC's part, two of the alleged "errors" are *de minimis* and two turn on complicated questions of law; none of the four merits a finding that the presumption of validity is overthrown. Prior uncopyrighted broadcasts of "Peter Pan" in 1955 and 1956 would not necessarily result in the denial of registration for the 1960 version because there was a "substantial change" between the versions. *See, e.g., Eckes*, 736 F.2d at 861 (later edition of baseball card guide copyrightable). The claim that NBC was the author of the entire work including "new script, dramatic, choreographic & mu-

sical material and all new cinematographical material," *see* Pl.Ex. 1, items 2(1), 6 (application for copyright registration), was substantially true; whether or not the script, stage business, music and choreography of the 1960 production changed from the theatrical production, the fact remains that the "cinematographical material," *i.e.*, the camera placements, the editing and direction of the camera views, the color mix and the like, were authored by NBC employees.

The claims that NBC erred in classifying "Peter Pan" as a "work for hire" and as an unpublished work turn on relatively complicated legal analysis. *See* 17 U.S.C. § 101 (definition of "work made for hire" involves determination of "scope of employment" or, in the alternative, of "collective work"); *see infra* section 3 (discussion of publication). It would be difficult indeed for me to find that an error in either of these categories was "knowing." On the record before me it is impossible.

### 2. *Derivative Work and Work For Hire*

Sonneborn urges this Court to conclude that NBC has no interest in "Peter Pan" that is capable of being copyrighted. He argues that NBC only made "trivial" additions to the underlying theatrical work and that it did not expressly reserve title to itself in the work of the actors, writers and other creative people connected with the 1960 production of "Peter Pan." Neither of these claims has merit because Sonneborn incorrectly interprets the nature of NBC's copyrightable interest.

Section 102 of the Copyright Act includes "motion pictures and other audiovisual works" in its definition of "works of authorship" that are subject to copyright protection. 17 U.S.C. § 102(a)(6) (1982). Subsection (a) of section 103 provides that this protection extends to "derivative works" and subsection (b) limits the protection to "the material contributed by the author of such work, as distinguished from the preexisting material employed in the

work." 17 U.S.C. § 103(a), (b) (1982). Section 101 defines derivative work:

> a work based upon one or more preexisting works, such as a translation, musical arrangement, *dramatization*, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or *other modifications which, as a whole, represent an original work of authorship*, is a "derivative work."

17 U.S.C. § 101 (emphasis added). The 1960 NBC production of "Peter Pan" meets the requirements of a derivative work.

I viewed the 1960 and 1956 versions of "Peter Pan" side by side. Innumerable differences of camera angle, stage direction and editing of camera views were apparent between the two versions. These differences in the 1960 version amount to "modifications which, as a whole, represent an original work." NBC did not have to change the content of the theatrical production of "Peter Pan" in order to author an audiovisual work worthy of copyright protection. Rather, the television production itself was a modification of the original work. Defendant Sonneborn should be well aware that audiovisual works such as this one are unique and original. His market is made up of people who consider these television productions to be original. As he testified at trial, "If collectors who buy our products want to have an authentic product, we wouldn't edit the product in any way. We give it to them with the commercials and bloopers if there are mistakes made as often [as] there are on live television." Tr. 3–29.

■ Moreover, the differences between the 1956 and 1960 versions of "Peter Pan" satisfy the subsidiary requirement that the derivative work be original. The original aspects of a derivative work must be more than trivial. *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909–11 (2d Cir.1980) (Meskill, *J.*) (plastic reproductions of Walt Disney cartoon characters not sufficiently original to support copyright). Novelty, uniqueness and ingenuity are not required to create a copyrightable interest, but independent creation is required. *Id.* at 910. Independent creation cannot be actual copying. *Id.; L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir.) (in banc), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976); *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–03 (2d Cir.1951). In this case NBC did not "copy" the theatrical production, it did produce an audiovisual work that was distinct both from the theatrical production and the 1956 audiovisual work. The element of independent creation occurred in the direction of cameras, color mix, stage business and special effects.

■ Sonneborn also argues that NBC had no rights in the performance because some of its contracts did not reserve to NBC title in the resulting work. Here again, the Defendant incorrectly analyzes the nature of NBC's interest.

Under *Roth v. Pritikin*, 710 F.2d 934, 937–40 (2d Cir.), *cert. denied*, 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983), the law as it existed prior to January 1, 1978 controls for works created under employment contracts when the work itself was created before January 1, 1978. According to that law, "[i]n the absence of evidence to the contrary, ownership of the copyright would … be presumed to lie with the 'person at whose instance and expense the work [was] done.'" *Id.* at 937 n. 3 (quoting *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567 (2d Cir.1966)). Here, NBC employed the actors, music director and others; it thus has a copyrightable interest in the fruit of their labors.

### 3. Publication

Under the 1909 Act the author of a work had the right to copy and profit from it. The author could distribute and show it to a limited class of persons without losing that right. If the author made a general publication of the work, however, the work passed into the public domain and anyone

could copy or profit from the work unless the author obtained protection under the statute. *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 299, 28 S.Ct. 72, 77, 52 L.Ed. 208 (1907). The concept of publication retains some importance under the 1976 Act. *See generally* 1 M. Nimmer, *Nimmer on Copyright* § 4.01[A] (1985) (*Nimmer*). Its importance to this case is derived from the fact that if NBC published "Peter Pan" more than five years before March 1980 when it applied for copyright protection then its certificate of registration would lose the presumption of validity under section 410(c). 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright....").

a. *Applicable Law*

■ The video tape of "Peter Pan" that is at issue in this case was broadcast in 1960 while the 1909 Copyright Act was in effect. The copying that gave rise to the cause of action occurred in 1980, after the 1976 Copyright Act went into effect. The two Acts have different definitions of publication; our choice of definition determines the outcome of this case. Sonneborn argues that the preemption provision of the 1976 Act requires that the new definition of publication be applied retroactively; under that new definition "offering to distribute copies ... to a group of persons for purposes of ... public performance ... constitutes publication." 17 U.S.C. § 101. Under this definition, NBC's delivery of audition copies and its lease of copies of "Peter Pan" to foreign television stations would probably amount to publishing them.

Sonneborn makes a superficially attractive argument to support the application of the new definition of publication. He argues that section 301 of the 1976 Act preempts the common law definition of publication and substitutes a definition that was developing at common law before 1976. Section 301(a) states:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a) (1982). Sonneborn would have us read this section so that the common law right to make a limited publication without losing the right to claim statutory copyright protection is an "exclusive right within the scope of copyright" in a work. Furthermore, according to Sonneborn's interpretation, that right is now to be "governed exclusively by" the provisions of the 1976 Act. There is some legislative history to support the view that Congress intended to eliminate the importance of publication:

2. "Publication," perhaps the most important single concept under the present law, also represents its most serious defect. Although at one time, when works were disseminated almost exclusively through printed copies, "publication" could serve as a practical dividing line between common law and statutory protection, this is no longer true. With the development of the 20th-century communications revolution, the concept of publication has become increasingly artificial and obscure. To cope with the legal consequences of an established concept that has lost much of its meaning and justification, the courts have given "publication" a number of diverse interpretations, some of them radically different. Not unexpectedly, the results in individual cases have become unpredictable and often unfair. A single Federal system would help to clear up this chaotic situation.

H.R.Rep. No. 1476, 94th Cong. 2nd Sess. 129–30 (1976); *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5745. Unfortunately, Sonneborn's argument proves too much. The legislative history just quoted shows that Congress intended the new definition of "publication" to be a break with the past rather than an expression of an evolving concept. It also does not support the view that Congress intended the 1976 Act to apply retrospectively to actions taken with a view to earlier copyright law.

Moreover, other courts that have considered the retroactive effect of section 301 have concluded that the 1976 Act's standard does not apply to asserted publications occurring before the effective date of the new Act, even though the cause of action accrued after the date. *Brown v. Tabb,* 714 F.2d 1088, 1091 (11th Cir.1983); *Data Cash Systems, Inc. v. JS & A Group, Inc.,* 628 F.2d 1038, 1041–42 (7th Cir.1980); *Paramount Pictures Corp. v. Rubinowitz,* 217 U.S.P.Q. 48, 49 (E.D.N.Y.1981). In *Roth v. Pritikin,* 710 F.2d 934, 937–40 (2d Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 394, 78 L.Ed.2d 337 (1983), Judge Irving R. Kaufman, writing for the Court of Appeals of this Circuit, held that the definition of "work for hire" would not be applied retrospectively. According to Judge Kaufman, "[s]ection 301 does not ... purport to determine who holds a copyright for works created before January 1978. It merely clarifies the rights of individuals owning copyrights on that date...." *Id.* at 938. He also noted in passing that retrospective application of the new definition might raise questions as to the constitutionality of the 1976 Act. *Id.* at 939.

The common law definition of publication as it existed prior to January 1978 will be applied to determine whether or when NBC published "Peter Pan."

b. *Publication and Limited Publication*

Sonneborn argues that any of six acts amounted to NBC's publishing the 1960 version of "Peter Pan:" (1) delivery of kinescopes to NBC affiliates for delayed broadcast; (2) delivery of audition copies to European broadcasters to promote the leasing of "Peter Pan;" (3) delivery of a copy to the star of "Peter Pan" (Mary Martin); (4) leasing of copies for airing in five foreign countries; (5) donation of a copy to the Museum of Broadcasting (MOB); and (6) preparation of copies for NBC's in-house use in connection with plans for videodisc marketing. I conclude that none of these acts caused NBC to lose the right to statutory copyright protection.

Although this conclusion is easily stated, it nonetheless requires some elaboration. This case is close and the law governing it is subject to dispute.

In *Patterson v. Century Productions, Inc.,* 93 F.2d 489 (2d Cir.1937), *cert. denied,* 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938), the author of a motion picture about big game hunting in Africa showed the picture without charge to his employees and delivered it to the Y.M.C.A. to further deliver to "religious, educational, and social organizations to be shown upon the express restrictions that no charge should be made to the exhibitors except the actual cost of transportation and that no charge should be made by the exhibitors to those who should see the picture." *Id.* at 491. The defendant in that case obtained and copied the film and was later sued by the author. The defendant claimed that the film had been published and thus could not be copyrighted, the plaintiff having failed to obtain statutory protection in the first instance.

The Court of Appeals held that there was no publication. The Court looked to the "noncommercial" nature of the transactions and to the limits placed on the exhibitors' use of the copies. "As the distribution was limited to exhibitions of the picture without charge, no one was given the right to use the copies sent out for any other purpose whatsoever." *Id.* at 492–93. A leading authority on copyright law concluded from *Patterson* that distribution of a film on an "unrestricted *and* commercial basis" should be found to be a general

publication of the film. 1 *Nimmer* § 4.11[A] at 4–54 to 4–55 (emphasis added).

Forty-two years after *Patterson* the United States Court of Appeals for the First Circuit decided *Burke v. National Broadcasting Co.*, 598 F.2d 688 (1st Cir.), *cert. denied,* 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979). There, the author of another animal film mailed a copy of the film to a German naturalist to use in an educational television program. The naturalist later allowed a British company to incorporate the footage in a film without the author's permission. The British film company then sold its film to NBC. When the author sued NBC for infringing his common law copyright, the trial court found that the author's release of the film to the German naturalist was a publication, noting that the author did not expressly prohibit the naturalist from copying or further distributing the film. *Burke v. National Broadcasting Co.*, 462 F.Supp. 267, 272 (D.N.H.1978). The Court of Appeals held that the film had not been published. 598 F.2d at 693. It noted that mere performance of a work is not publication. *Id.* at 691 (citing *Ferris v. Frohman,* 223 U.S. 424, 435, 32 S.Ct. 263, 266, 56 L.Ed. 492 (1912)). It discussed the doctrine of general publication. 598 F.2d at 691. ("A general publication occurs when a work is made available to members of the public at large without regard to who they are or what they propose to do with it.") It summarized its view of the doctrine of general publication by stating that "courts have hesitated to find general publication if to do so would divest the common law right to profit from one's own work." *Id.* (citing *Hirshon v. United Artists Corp.*, 243 F.2d 640, 644–45 (D.C.Cir.1957); *American Visuals Corp. v. Holland,* 239 F.2d 740, 744 (2d Cir.1956)). *See also generally Roy Export Co. v. Columbia Broadcasting System,* 672 F.2d 1095, 1101–02 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (discussion of the distinction between investive and divestive publication, noting that courts "sometimes insist upon a more extensive factual basis for finding a 'divestive' publication.").

The *Burke* Court discussed the concept of "limited publication" and quoted its most common definition. A limited publication:

"communicates the contents of a [work] to a definitely selected group and for a limited purpose, ... without the right of diffusion, reproduction, distribution or sale.... [T]he circulation must be *restricted both as to persons and purpose* ...."

*Burke,* 598 F.2d at 692 (quoting *White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir.), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952) (emphasis added by the *Burke* Court). Discussing *Patterson* in light of the concept of limited publication, the *Burke* Court noted that a limited publication was made "where the range and purpose of distribution did not suggest that the general public was free to obtain and use the work." 598 F.2d at 692. The Court held that only a limited publication had been made in the case before it because the distribution to the German naturalist was made with implied restrictions on distribution and copying. *Id.* at 693.

Recently a district court in this Circuit reached the same conclusion. In *Paramount Pictures Corp. v. Rubinowitz,* 217 U.S.P.Q. 48 (E.D.N.Y.1981), the owner of the Star Trek television series syndicated the series by leasing it to television stations for rebroadcast. The defendant in that case contended that the syndication was a general publication of the series. After reviewing the *Burke* opinion, the district court in *Paramount* held that there was only a limited publication of the television series. *Id.* at 50–51. It did so by analyzing the licensing agreements between *Paramount* and the television stations. The court discovered that in the standard licensing agreements the owner contracted for the return of the prints of the series, required that broadcast be to non-paying audiences, prohibited copying of the prints and mandated that the licensee remain in possession of the prints at all times. *Id.* at 51. It concluded that the series was published to a limited group

because the owner entered into an individual contract with each and every television station licensed to broadcast the series. *Id.*

Although Judge Bramwell's decision in *Paramount* has been criticized, *see* 1 *Nimmer* § 4.11[B] at 4–56, § 4.13[A] at 4–66 n. 9, I believe that his analysis is instructive and correct. The licensees in *Paramount*, unlike regional film distributors, did not have any right to put a third party (over whom the owner of the television series had no control) into possession of the prints. Instead, the owner jealously protected its right to control who had the right to broadcast the series and its right to prevent the copying of its property.

With that review of the law in mind, I turn to the facts of this case.

■ Delivery of the kinescopes of "Peter Pan" to NBC affiliates for delayed broadcast in 1960 was at most a limited publication. There is no reason to doubt that NBC enforced its policy of policing the return of the kinescopes and thus preserved its contractual right to prevent affiliates from making copies of NBC productions for their own use. The group of affiliates was clearly limited to parties with whom NBC enjoyed contractual relations.

■ The act of providing audition copies of "Peter Pan" to prospective licensees was also at most a limited publication. Here there was an implied prohibition on broadcast and copying; the audition prints were not of broadcast quality and no prospective licensee was known by NBC ever to have made copies or broadcast an audition print. Moreover, the prints were distributed to a limited group. *See Allen v. Walt Disney Productions*, 41 F.Supp. 134, 135–36 (S.D. N.Y.1941) (submission of manuscript to publishing company that did not buy the right to publish did not amount to general publication). The group of prospective licensees did not constitute the general public, especially during the era in question. The number of persons with the technical ability to broadcast or copy "Peter Pan" was relatively small in the early to mid-1960s.

■ The transfer of a copy of "Peter Pan" to its star, Mary Martin, was also not a publication. NBC clearly prohibited her from copying or selling the print. She was a member of a limited class, a performer with enough bargaining power to get the print as part of her contract with NBC.

■ The licensing of "Peter Pan" to foreign broadcasters likewise was not a general publication. NBC protected its rights in the work just as it had with its affiliates. The question whether this group was a limited class is relatively close; Judge Bramwell's reasoning in *Paramount* is persuasive here for reasons discussed above.

■ The donation of a print of "Peter Pan" to MOB was at most a limited publication. MOB has the right to copy the print, but only for purposes specified in the agreement with NBC; it cannot copy it for commercial purposes. It probably cannot give copies of the print to other museums, because it only has title to the single physical copy that NBC gave it; NBC reserved "any title to, or artistic or literary rights in" the film. Pl.Ex. 123 ¶ 4. MOB is also a member of a limited group, a group of museums with whom NBC has individually contracted to possess a print of "Peter Pan" for limited purposes.

■ Finally, and least consequentially, the preparation of videotapes of "Peter Pan" for NBC's own use in connection with RCA's discontinued videodisc program is irrelevant to this case. Even in the unlikely event that this was a publication, it occurred within five years of the time when NBC applied for its certificate of registration. *See* 17 U.S.C. § 410(c).

In sum, NBC did not publish "Peter Pan" in a manner that would cause it to lose the right to receive statutory copyright protection for the work. It did not make any knowing misstatements to the Copyright Office. It properly claimed that it created a new audiovisual work for hire. NBC's certificate of registration and copyright are thus valid under section 410(c). Sonne-

born's copying is admitted; copyright infringement under section 501 is proved.

## B. Lanham Act Claims

The letters "NBC" are a registered service mark. Pl.Ex. 4. The mark was found in the opening and closing credits of the show, in Defendant's catalogs and in his packaging. *See* Pl.Ex. 88. *See generally* Tr. 3-25 to 3-29. NBC claims that this copying violated section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a) (1982). The statute provides that a person who uses a "reproduction" of a registered mark of another without consent is liable if that person uses the mark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a).

■ The relevant inquiry under the statute is whether the appearance of the mark is "likely to cause confusion." NBC need not demonstrate that Sonneborn's use of the mark caused actual confusion to consumers. *W.E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661-62 (2d Cir.1970). *See also Invicta Plastics (USA) Ltd. v. Mego Corp.,* 523 F.Supp. 619, 622 (S.D.N.Y. 1981). The same standard applied to NBC's claims under 15 U.S.C. §§ 1114(1)(b) and 1125. *Invicta Plastics,* 523 F.Supp. at 622 (citing *Clarks of England, Inc. v. Glen Shoe Co.,* 485 F.Supp. 375 (S.D.N.Y.1980); *Markel v. Scovill Mfg. Co.,* 471 F.Supp. 1244 (W.D.N.Y.), *aff'd,* 610 F.2d 807 (2d Cir.1979)).

In determining the likelihood of confusion, this Court is bound by the test of the Restatement of Torts §§ 729, 730, 731 (1938), adopted by this Circuit in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.) (Friendly, *J.*), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The test has many factors and applies where, as here, the products of the plaintiff and defendant are not in competition with one another. The likelihood of confusion is determined by (1) the strength of the senior mark; (2) the degree of sim-ilarity between the two marks; (3) the proximity of the products; (4) the likelihood that the senior user will bridge the gap between its products and the infringer's; (5) actual confusion; (6) the infringer's good faith; (7) the quality of defendant's product; and (8) the sophistication of the buyers.

■ The evidence that confusion is likely is neither impressive nor persuasive in this case. It is beyond cavil that NBC is a strong mark; Sonneborn used that exact mark to identify the production of "Peter Pan" contained on his videotape. The products are not highly similar; NBC's product is a broadcast to a mass market, Sonneborn's is a videotape of that original broadcast but for a market made up largely of collectors. NBC has not successfully bridged the gap to market "Peter Pan" on its own; the difficulty with obtaining license approval and the demise of the RCA videodisc program make it unlikely that NBC will bridge the gap any time soon.

NBC did not present any evidence of actual confusion. It did not show that Sonneborn used the letters "NBC" to. mislead customers into thinking that NBC authored or licensed the videotape product; the available evidence indicates that Sonneborn and his customers thought they were dealing in a production authored by NBC that had fallen into the public domain.

The only evidence that NBC did introduce on the subject of confusion emphasized that Sonneborn's product was not of as high a quality as NBC's. The route to Sonneborn's final product was arduous: from the negative kinescope, Tr. 86-87, to the public library print to the videotape master print, to the final product. *See* Tr. at 3-30 to 3-31. Given the fact that Sonneborn's clientele was made up of collectors who might be familiar with other videotapes of public domain works, however, the stronger inference is that the poor quality of graphic resolution would *decrease* confusion. *See* Tr. 3-32. Moreover, Sonneborn did not falsely represent that the graphic resolution of the "Peter Pan" videotapes

was of high quality in comparison to the broadcast quality of the program, as NBC claims he did. Rather, the advertisements and literature connected with the distribution of this program indicated that the program was of high caliber (NBC does not dispute this) and that the Reel Images' reproduction of the program was carefully done. The evidence presented by Sonneborn at trial affirmed this assertion. *See* Tr. 3–30 to 3–32. It was not rebutted by NBC.

The only evidence on the issue of actual confusion was presented by Sonneborn. He testified that each box containing a videotape of "Peter Pan" was wrapped in cellophane; between the box and the cellophane was a "video card." The card gave the title of the program, described it and contained the registered trademark of the corporate Defendant Reel Images. *See* Tr. 3–28 to 3–29. This evidence of the lack of actual confusion on the part of those who actually bought the program is not dispositive of the issue of whether confusion was likely, but it is persuasive in view of the fact that NBC produced little or no evidence on the issue of likelihood of confusion.

Finally, despite NBC's broad assertion that Sonneborn's catalog was available to anyone who wanted it, it presented absolutely no evidence as to who actually bought the videotapes. The only evidence on the record is Sonneborn's testimony that his clientele was made up of collectors, buyers who would presumably be sophisticated enough not to believe that NBC produced the videotapes of "Peter Pan" sold by Sonneborn.

NBC also argues that it need not establish that consumers would believe that NBC actually *produced* the videotapes of "Peter Pan." It correctly states that *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema*, 604 F.2d 200, 204–05 (2d Cir. 1979), is authority for this proposition. In that case the Dallas Cowboy cheerleaders successfully obtained a preliminary injunction against the distribution and exhibition of a "gross and revolting sex film" called

"Debbie Does Dallas." *Id.* at 202. The defendant's film contained twelve minutes of footage portraying an actress in a uniform "strikingly similar" to the cheerleaders' engaging in various sexual acts. *Id.* at 203. The film was promoted with posters of the same uniformed actress; the posters identified the plaintiff cheerleading corporation with the movie by falsely stating that the uniformed actress was a former member of the corporation's staff. *Id.* & n. 2.

On these facts the circuit court held that the defendant's film created an "association" that resulted "in confusion which has 'a tendency to impugn [plaintiff's services] and injure plaintiff's business reputation.'" *Id.* at 205 (quoting *Coca-Cola Co. v. Gemini Rising, Inc.*, 346 F.Supp. 1183, 1189 (E.D.N.Y.1972)).

The innumerable differences between the circumstances of this case and those in *Cheerleaders* discourage this Court from extending the Lanham Act's definition of "likelihood of confusion" as far as it was extended in that case. NBC presented absolutely no direct evidence that Sonneborn's videotapes created an association that had "a tendency to impugn [NBC's] services and injure [its] business reputation." The circumstantial evidence it presented was unpersuasive. The poor graphic resolution in Sonneborn's tapes is unlikely to impugn NBC's production values in the present. The failure to establish this association prohibits the extension of Lanham Act coverage to this case.

NBC has failed to prove that the Defendant's videotapes created a "likelihood of confusion" and thus it has failed to prove its claims for injunctive relief, damages, costs and attorneys' fees under the Lanham Act.

### C. *Unfair Competition*

#### 1. *Choice of Law*

NBC also brings claims grounded in the state law of unfair competition against Sonneborn. This Court has jurisdiction of the unfair competition claim both as a di-

versity action, 28 U.S.C. § 1332, and under 28 U.S.C. § 1338(b).

■ Applying Connecticut law to this case includes applying its choice of law rules. Connecticut's choice of law in this tort action is governed by the rule of *lex loci delicti*. *See Bailey Employment System v. Hahn*, 655 F.2d 473, 476 (2d Cir. 1981) (Meskill, *J.*); *see also Gibson v. Fullin*, 172 Conn. 407, 411, 374 A.2d 1061 (1977).[3] Under Connecticut law a tort is committed where the injury is sustained. *Patch v. Stanley Works*, 448 F.2d 483, 491 (2d Cir.1971); *Commonwealth Fuel Co. v. McNeil*, 103 Conn. 390, 405, 130 A. 794 (1925).

■ NBC alleges that the injury that occurred was to its reputation, business goodwill and ability to market videotapes of "Peter Pan." It concedes that some of this injury occurred in Connecticut, because it has a national reputation, but notes that New York is its principal place of business and therefore argues that the injury will be most acutely felt in New York. Sonneborn has raised no arguments on the choice of law issue.

The Court will apply New York law to decide this case. *See Mattox v. News Syndicate Co.*, 176 F.2d 897, 900 (2d Cir.), *cert. denied*, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525 (1949) (L. Hand, *J.*) (in diversity case where *lex loci delicti* rule applied, injury due to defendant's libel held to have occurred in state of plaintiff's residence).

### 2. *Preemption*

■ NBC likens its claim of unfair competition to claims of "palming off" and commercial immorality. The "palming off" claim is not preempted by section 301 of the Copyright Act of 1976, 17 U.S.C. § 301. *Warner Brothers v. American Broadcasting Companies*, 720 F.2d 231, 247 (2d Cir. 1983).

■ The commercial immorality claim, however, is preempted. NBC emphasizes that this doctrine is broad and flexible. Indeed, in a case arising under the Copyright Act of 1909, this Circuit recounted the breadth of New York unfair competition law and the commercial immorality doctrine. *Roy Export Co. v. Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). According to NBC, "[t]he essential elements of a claim of commercial immorality are unfairness and an unjustifiable attempt to profit from another's expenditure of time, labor and skills." Plaintiff's Post Trial Memorandum of Law at 69; *accord, Roy Export*, 672 F.2d at 1105.

The breadth of the commercial immorality doctrine argued by NBC bumps squarely up against the preemptive language and policy adopted by Congress in section 301. The right not to allow another to profit from one's "expenditures of time, labor and skills" is embodied in the prohibitions against copying copyrighted work. *See* 17 U.S.C. § 106. Copying is an exclusive right within the scope of the copyright law. It does not come within the definition of a legal or equitable right "not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(b)(3). Hence, a commercial immorality claim based on copying is preempted.

### 3. *Palming Off*

NBC argues that Sonneborn tried to palm off the videotapes of "Peter Pan" as

---

**3.** After *Bailey* was decided the Second Circuit adopted a different choice of law test for a Connecticut tort case arising out of an aviation disaster. *Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 674–76 (2d Cir.1983) (citing Restatement (Second) of Conflict of Laws § 145 (1971)). The *Saloomey* Court confined its decision to aviation accidents. *Id.* at 674–75.

Even were I to find that Connecticut would follow the Restatement (Second) of Conflict of Laws § 145 in an unfair competition case, the result here would be no different. Although the conduct causing the alleged injury occurred in Connecticut, it was foreseeable that the injury from the alleged unfair competition would occur primarily in New York. The actor is domiciled in Connecticut, but his alleged victim is domiciled in New York. There is no relationship between the parties. In view of the magnitude and foreseeability of the alleged injury the most significant contacts in this case are with New York.

an NBC-sponsored product. The argument verges on being frivolous.

■ Under New York law, proof of likelihood of confusion as to the source of a product is essential to prevail on a claim of palming off. *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 624 (2d Cir.1983); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977); *Dell Publishing Co. v. Stanley Publications, Inc.*, 9 N.Y.2d 126, 134, 211 N.Y.S.2d 393, 172 N.E.2d 656 (1961).

■ The source of the original production and broadcast of "Peter Pan" indisputably is NBC. There was no evidence that Sonneborn ever tried to mislead the public into thinking that either he or Reel Images was the source of the production or broadcast. The source of the videotape recording of "Peter Pan" that Sonneborn merchandised was Reel Images. The available evidence was that the members of the buying public who purchased Reel Images products thought they were buying recordings of programs that had fallen into the public domain. There was also no evidence that Sonneborn misled the buying public into believing that NBC provided Reel Images with videotapes or kinescopes of the production of "Peter Pan" from which to make the videotape cassettes that Reel Images merchandised.

·NBC argues further that the very act of copying and reproducing "Peter Pan" constituted the attempt to "palm off." There is no merit to this argument because the right to control copying and reproduction of an article is an "exclusive right" under 17 U.S.C. § 106 and thus even if New York law would equate "copying" with "palming off," the claim would be barred by section 301 of the Copyright Act of 1976. 17 U.S.C. § 301.

I thus conclude that NBC did not establish its claim under the New York law of unfair competition.

### 4. *The New York Antidilution Statute*

New York General Business Law section 368–d provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y.Gen.Bus.Law § 368–d (McKinney 1984). Even if NBC had established its right to recover under this statute, that would add nothing to the relief awarded by this Court on the copyright claim.

■ NBC has a distinctive mark and name. *Cf. Le Cordon Bleu v. Littlefield*, 518 F.Supp. 823, 826–27 (S.D.N.Y.1981). Moreover, it is true that Sonneborn copied the distinctive NBC logo in the opening and closing credits of "Peter Pan" and named NBC as the source of the program in the advertising and labeling of the videotape cassettes of "Peter Pan." This does not prove, however, that these acts are likely to blur the public's identification of the NBC name with rigorous television production standards or lead to unfavorable consumer associations. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983).

Here again, it is important to note that Sonneborn *copied* "Peter Pan." He never claimed that NBC provided him with the original kinescope or videotape of "Peter Pan." The claims in Sonneborn's advertisements about the quality of the "Peter Pan" program and Reel Images' production values would not be likely to confuse the public about the quality of NBC's original production values. NBC presented no evidence that it would cause this "blurring," *see Sally Gee*, 699 F.2d at 625–26, relying instead on simple proof that Sonneborn copied a kinescope of "Peter Pan." Proof that copying occurred does not prove that confusion of the kind required under New York Business Law section 368–d is the likely result of that copying.

## D. *Relief*

NBC has established that it has a valid certificate of copyright registration. An unauthorized copying of "Peter Pan" is admitted. Therefore, copyright infringement under section 501 of the Copyright Act of 1976 has been proved. 17 U.S.C. § 501.

NBC is entitled to a permanent injunction under section 502 of the Act. 17 U.S.C. § 502(a) (1982). A permanent injunction may issue under this section "when liability has been established and there is a threat of continuing violations." *Encyclopaedia Britannica Educational Corp. v. Crooks*, 542 F.Supp. 1156, 1187 (W.D.N.Y.1982) (citing *Universal City Studios v. Sony Corp. of America*, 659 F.2d 963, 976 (9th Cir.1981)).

Sonneborn has a video master copy of "Peter Pan." He continued to sell videotapes that infringed on NBC's copyright until the preliminary injunction was issued in this case. I find and conclude that there is a sufficient threat of continuing violations to justify the issuing of a permanent injunction against Sonneborn and Reel Images.

Sonneborn suggests that the injunction be limited. He suggests that the injunction require only that he excise the portions of the 1960 production of "Peter Pan" that infringe on the earlier uncopyrighted versions. I decline to issue such an order because I find enough cinematographical differences in the 1960 version to justify enjoining the Defendants from all unauthorized copying of the work.

For the foregoing reasons, Plaintiff's request for a permanent injunction is granted. Defendants, their agents, employees, representatives and all others acting on their behalf are prohibited, enjoined and restrained from copying Plaintiff's copyrighted 1960 broadcast version of "Peter Pan."

NBC also requests that this Court order Sonneborn to deliver to it all copies, master recordings, catalogs, advertisements and other materials related to the 1960 production of "Peter Pan." Such an order is authorized under section 503 of the Copyright Act of 1976. 17 U.S.C. § 503(b) (1982). The request will be granted with respect to the copies and master recordings. NBC did not prove that the catalogs, advertisements and other materials infringed its copyright, violated the Lanham Act or competed unfairly. There is thus no legal or equitable basis to order the destruction of the catalogs, advertisements and other materials.

For the foregoing reasons, the Defendants are hereby ordered to surrender to the Plaintiff all copies and videotape master recordings of the 1960 production of "Peter Pan" presently in their possession or control. The Defendants are also ordered to tender to NBC a sworn affidavit stating that they have surrendered to the Plaintiff all copies and master recordings.

NBC is entitled to actual damages. 17 U.S.C. §§ 504(a) and (b) (1982). Sonneborn testified that he sold 30–40 videotape copies of the program at the price of $49.95 for "Beta" format tapes and $52.95 for "VHS" format tapes. Deposition of Jonathan Sonneborn, pp. 33, 36–37. He was unable to allocate the sales to their respective formats. He presented no evidence of his costs. Section 504(b) clearly requires him to shoulder the burden of proving his costs once the Plaintiff showed his gross sales. 17 U.S.C. § 504(b). I thus find that NBC's actual damages were $2,118.00, representing gross revenues from the sale of 40 VHS format tapes at $52.95 per tape.

This is not an appropriate case to find either that Sonneborn was a "willful" infringer as NBC claims or that he was "innocent" as he claims. *See* 17 U.S.C. § 504(c)(2). NBC's only proof of willfulness was the fact that Sonneborn failed to check with it before he produced the infringing cassettes. Sonneborn was under no duty to make such a check and so was not a willful infringer. Sonneborn's claim of innocence is grounded in his efforts to learn whether "Peter Pan" was protected by a copyright registration.

Sonneborn was not entitled to rely on the copyright search he made. The Copyright Office has made this clear:

> Searches of the Copyright Office catalogs and records are useful in helping to determine the copyright status of a work, but they cannot be regarded as conclusive in all cases. The complete absence of any information about a work in the office records does not mean that the work is unprotected.

Copyright Office Circular R22: "How to Investigate the Copyright Status of a Work," *reprinted in* 1 Copyright L.Rep. [CCH] ¶ 15,021 at 8048 (1982).

■ Both NBC and Sonneborn claim the right to be awarded costs and attorneys' fees under section 505 of the Copyright Act. 17 U.S.C. § 505 (1982). Our Circuit recently noted that attorneys' fees "generally" are awarded to prevailing plaintiffs because section 505 exists to encourage persons to assert colorable copyright claims. *Diamond v. Am-Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir. 1984). It held that attorneys' fees are to be awarded to prevailing defendants when the plaintiff's claims are "objectively without arguable merit." *Id.* Sonneborn's request for costs and attorneys' fees clearly fails to meet this standard: NBC prevailed because its arguments had merit.

■ Under the new Act, the award of costs and attorneys' fees is discretionary. 17 U.S.C. § 505. In an action brought under the Copyright Act of 1909 (in which an award of costs was mandatory to the prevailing party but an award of attorneys' fees was left to the discretion of the court), Judge Blumenfeld noted the following factors that might guide the Court in the exercise of its discretion to deny an award of attorneys' fees: (1) the presence of a complex or novel issue of law that the defendants litigate vigorously and in good faith; (2) the defendants' status as innocent infringers; (3) the plaintiffs' prosecution of the action in bad faith; and (4) the defendants' good faith attempt to avoid infringement. *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 915 (D.Conn.1980).

Two of the four factors noted above are present in this case. The issue of whether "Peter Pan" had been published prior to 1976 was complex and Sonneborn litigated it in good faith. Sonneborn's copyright search was not enough to make him an innocent infringer, but it did amount to a good faith attempt to avoid infringing on NBC's copyright. For these reasons, NBC's request for costs and attorneys' fees is denied.

In summary, NBC is entitled to a permanent injunction against infringement of its copyrighted version of the 1960 production of "Peter Pan." It is entitled to have infringing copies and masters destroyed. It is entitled to $2,118.00 damages. Its request for costs and attorneys' fees is denied. This memorandum shall constitute the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

It is so ordered.