**ORIGINAL APPALACHIAN ARTWORKS, INC.**

v.

**J.F. REICHERT, INC., and Joseph F. Reichert.**

**Civ. A. No. 85–3483.**

United States District Court, E.D. Pennsylvania.

March 13, 1987.

**460**

Zachary T. Wobensmith, Philadelphia, Pa., for plaintiff.

E. Jerome Brose, Charles W. Elliott, Easton, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

The plaintiff instituted this action seeking a temporary restraining order, a preliminary injunction, a permanent injunction and monetary relief. It alleged in its complaint that the defendants violated various provisions of the Copyright Act of 1976, 17 U.S.C.A. §§ 101–810 (West 1977 and Supp. 1986), and the Lanham Trademark Act of 1946, 15 U.S.C.A. §§ 1051–1127 (West 1982 and Supp.1986), by importing, marketing and selling in the United States soft sculptured dolls commonly known as the "Cabbage Patch Kids" (hereinafter "CPK").[1] We granted the TRO sought by the plaintiff on June 19, 1985. The order, *inter alia,* prohibited the defendant from further importing, marketing and/or selling the foreign CPK dolls pending a hearing on the plaintiff's request for a preliminary injunction. The TRO, by agreement of the parties, was continued until September 9, 1985, at which time the parties stipulated to the entry of a preliminary injunction the terms of which simply incorporated the proscriptions of the TRO. Following completion of discovery, the matter was tried before this Court, sitting without a jury, as to the issue of damages commencing October 16, 1986.

### I. THE FACTS.

The parties, for the most part, do not dispute the facts of this case. The plaintiff is the owner of copyright registration numbers VA 35–804 (Plaintiff's Exhibit [hereinafter "P"]–2) and VA 141–801(P–1) and trademark registration number 1,298,970 (P–3). The copyrights and trademark apply to various aspects of the CPK dolls. The plaintiff originally marketed the dolls under the trademark "The Little People", but since July of 1982 has promoted the dolls under the current trademark "Cabbage Patch Kids". The plaintiff, on August 8, 1982, granted a license to Coleco Industries, Inc., to manufacture, market and sell full-sized copies of the CPK dolls in the United States. This license was "ex-

---

1. Because the corporate defendant and the individual defendant are for the purposes of this action one and the same entity, they shall hereinafter be referred to in the singular.

clusive", *i.e.*, the plaintiff had not granted a license to any other entity to sell full-size copies of the dolls in this country. The plaintiff has granted licenses to other entities to manufacture, market and distribute the CPK dolls in areas outside of the United States.

The defendant Joseph F. Reichert is the owner/sole shareholder of J.F. Reichert, Inc. The defendant admits the following: (a) the validity of the plaintiff's copyright registration and ownership thereof; (b) the plaintiff's adoption, use, ownership and registration of the trademark "Cabbage Patch Kids"; and (c) that Coleco is the exclusive licensee allowed to manufacture, promote and sell full-size copies of the dolls in the United States. The defendant also admits that he imported and sold 67,307 CPK dolls not licensed for sale in this country, with gross revenues from the sale thereof of $2,097,186.91 during the period November, 1984, to June 19, 1985, *i.e.*, the date the plaintiff filed this action.

Joseph Reichert testified that he operated a "limited export/import business" through his corporation. He stated that he engaged primarily in the importation of foreign-made automobiles. This type of activity is commonly referred to as the importation of "grey-market" goods, *i.e.*, goods manufactured abroad by, *e.g.*, a licensee of the owner of U.S.-registered trademarks and/or copyrights which is not allowed to export to or distribute the goods in the United States. *See, e.g., Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903 (D.C. Cir.1986), *cert. granted,* — U.S. —, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986). Reichert stated that in the late summer-early fall of 1984, he became aware of the "craze" for CPK dolls, and of the problem merchants were having in meeting consumer demand for the product. This spurred him to investigate the possibility of importing the CPK dolls from Europe and selling them at a profit.

Reichert first determined that the dolls were indeed available on the European market. As stated above, the testimony indicated that the plaintiff had licensed a number of foreign companies to manufacture and distribute full-size copies of the CPK dolls in areas outside the United States. Reichert next contacted the United States Customs Office in Delaware, where the majority of the foreign automobiles he purchased arrived by ship, to determine whether there were any restrictions on importing the dolls. Reichert testified that the personnel in the Delaware Customs Office informed him that they knew of no such restrictions, but they instructed him to contact the Philadelphia Customs Office. He did so and was, once again, informed that the personnel he spoke with knew of no restrictions on importing the dolls; he was also informed that he should contact the New York Customs Office. As instructed, he called the New York Office of United States Customs, and was informed that there were no restrictions on importing the CPK dolls so long as they were "genuine", as opposed to unauthorized imitations or copies. He was also told to call the United States Customs Office in Washington, D.C., to confirm this information. This he did and, for the fourth time, was informed by employees of United States Customs that there were no restrictions on the importation of "authorized" copies of the work. *See Coalition to Preserve the Integrity of American Trademarks v. United States, supra.*

Reichert thereupon attempted to contact Coleco to determine if they knew of any reason that he should not attempt to import the dolls for resale in this country. Following calls to Coleco's offices in New York and Toronto, Reichert spoke with a woman in Coleco's legal department in its Connecticut office. She told Reichert that she would research the question and call him back. She neither contacted the defendant nor did Reichert ever attempt to pursue the issue by writing to Coleco or by calling her back.

The defendant's final step in this process was to obtain a license to distribute the dolls from the Pennsylvania Department of Labor and Industry. To obtain the license, Reichert was required to forward a sample doll to the agency so that it could be "tested". Following completion of the testing

procedures, the state agency issued Reichert a "registration number", which he was required to affix to the product. Reichert accomplished this by having adhesive labels with the registration number printed on them attached to the boxes containing the CPK dolls. (See P–13). Reichert, as required by federal law, 19 U.S.C.A. § 1304 (West 1980 and Supp.1986), also affixed adhesive labels to the dolls' packaging denoting the product's country of origin. (See P–14).

Reichert, through his contact in Hanover, West Germany, then began to purchase "European" CPK dolls. The defendant testified that he initially attempted to deal with a German distributor of CPK dolls, which had been made by Coleco exclusively for a German company known as Arxon. (See P–5). Arxon was, in fact, owned by Coleco. When the German distributor refused to deal with him, Reichert's contact in Germany simply began to buy up all the CPK dolls he could find in German "supermarkets". When the German supply was exhausted, the defendant's contact put him in touch with a man named Willy Hangartner, who arranged for shipments of the dolls to Reichert from a Spanish company named Jesmar. The plaintiff had authorized Jesmar to manufacture and sell the dolls in certain areas outside the United States, but it was in no way authorized to export the dolls to this country. Though there are certain differences between the "American" CPK dolls and the "European" CPK dolls, it is undisputed that the dolls Reichert imported were "genuine", "authorized" copies, and not "forfeitures" or "imitations".

Reichert testified that he sold approximately 16,000 to 18,000 of the dolls he imported to Hess's Department Store in Allentown, Pennsylvania. He sold the remainder himself or to other retailers like Hess's. The now infamous "adoption papers" which accompanied the European dolls were, as might be expected, not printed in English. (See P–8, German adoption paper which accompanied P–5). Reichert, therefore, had the foreign language documents "translated" into English. (See P–6, English version of Spanish adoption request, and P–7, English version of German adoption request). The English versions of the German and Spanish adoption requests are identical, with the exception of the addresses to which the requests were to be sent. The defendant either provided "proofs" of the translated adoption requests to retailers such as Hess's or supplied the documents himself for those dolls he sold to private individuals.

Reichert also testified that he sold a number of CPK dolls to a Minnesota company, which then developed a number of additional documents promoting the dolls. (See P–9 and 10). P–10, described by the defendant as an "information sheet", states that, "The kids from Europe are a little taller than their American cousins . . ." The sheet also states that, "There are not enough homes in Europe and they wanted to come to America". (P–10). Reichert testified that he supplied this information sheet to the retailers he sold dolls to. Interestingly, the information sheet openly states that, "These are original Cabbage Patch Kids ™ by Xavier Roberts, Appalachian Artworks, *copyright*". (P–10) (Emphasis added).

Finally, the defendant openly admitted that he had in a mass mailing campaign advertised the imported CPK dolls as "Genuine Original 16″ Cabbage Patch Dolls". (See P–15). Reichert stated that he obtained a mailing list from a partner in an unrelated venture, and in December, 1984, mailed "flyers" to potential customers. He stated that there was much skepticism as to the authenticity of the dolls, and that as a result, he sold only $250.00 worth of dolls from the mass mailing campaign. No where did the flyer indicate that the dolls were imported and as just stated, the flyer openly misrepresented that the dolls were manufactured by Coleco.

## II. THE COPYRIGHT ACT VIOLATIONS.

### A. Liability.

The plaintiff alleged that the defendant had committed four separate violations of the Copyright Act by importing and selling

the European CPK dolls. The acts the plaintiff claims constituted infringement of its copyrights are:

(1) importation and sale of the dolls;

(2) importation and sale of the packing for the dolls;

(3) importation and sale of the foreign language adoption papers; and

(4) reproduction and sale of the "phony" English-version adoption papers.[2]

■ The defendant admits the four separate copyright infringements as outlined above. It is, in fact, clear that Reichert's conduct constituted infringements of the plaintiff's copyrights. *See* 17 U.S.C.A. §§ 501(a) and 602(a) (West 1977); *see also, Columbia Broadcasting System, Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47 (E.D.Pa.1983), *aff'd. mem.*, 738 F.2d 421 (3d Cir.1984). Thus, we find the defendant liable to the plaintiff for four separate infringements of the plaintiff's copyrights.

### B. Damages.

At trial, the defendant agreed to the entry of a permanent injunction prohibiting him from committing any further infringing conduct, *i.e.*, prohibiting him from importing any more of the unlicensed European CPK dolls. The only remaining issue, therefore, is the assessment of monetary damages.

The plaintiff, prior to the close of trial, elected to recover statutory damages for the copyright infringements pursuant to 17 U.S.C.A. § 504(c)(1) and (2) (West 1977) in lieu of actual damages. *Compare* 17 U.S. C.A. §§ 504(b) and 504(c) (West 1977).

Section 504(c)(1) provides that:

Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $250 or more than $10,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

17 U.S.C.A. § 504(c)(1) (West 1977).

Section 504(c)(2) provides that:

In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $50,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $100.

17 U.S.C.A. § 504(c)(2) (West 1977).

The plaintiff argues that this Court, in the exercise of its discretion, should award it statutory damages of up to $200,000 for the four separate copyright infringements in accordance with § 504(c)(2). The defendant, to the contrary, argues that the plaintiff failed to sustain its burden of proving that he "willfully" infringed the plaintiff's copyrights and that, therefore, we may only award statutory damages in an amount not greater than $40,000. The defendant further asserts that he demonstrated that he was not aware, and had no reason to believe, that his acts constituted infringements of the plaintiff's copyrights and, therefore, in accordance with § 504(c)(2), this Court may and should award the plaintiff statutory damages of as little as $400.

■ The initial question we must answer is whether the defendant willfully infringed the plaintiff's copyrights. As just indicated, the burden is upon the holder of the copyright to demonstrate that the infringer acted willfully. *See Wow & Flut-*

---

2. The plaintiff in its complaint alleged that (a) the importation and sale of CPK "birth certificates" and (b) advertising by the defendant also constituted infringement of the plaintiff's copyrights. The plaintiff at trial abandoned these claims.

**464**

ter *Music v. Len's Tom Jones Tavern, Inc.,* 606 F.Supp. 554 (W.D.N.Y.1985). Unfortunately, Congress did not attempt to define the term "willfully" as utilized in § 504(c)(2). The burden has thus fallen upon the courts to give meaning to the word. In addressing this issue, other courts for the most part have defined "willfulness" as requiring the plaintiff to show that the infringer acted with actual knowledge or reckless disregard for whether its conduct infringed upon the plaintiff's copyrights. *Id. But see, Dreyer v. ARCO Chemical Company,* 801 F.2d 651 (3d Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987), (finding that employer's violation of Age Discrimination in Employment Act in disparate treatment case was "willful" may not be based solely on evidence that employer knew or acted in reckless disregard of whether its conduct violated the ADEA, but requires some additional evidence of "outrageous conduct" beyond mere violation of ADEA). We adopt this standard as our own. Applying it to the case *sub judice,* we find that the defendant's conduct did not constitute willful infringement of the plaintiff's copyrights.

The instant case is greatly similar to that of *National Broadcasting Co., Inc. v. Sonneborn,* 630 F.Supp. 524 (D.Conn.1985). In *Sonneborn,* NBC contended that the defendant willfully infringed its copyrights because he failed to check with it before copying NBC's copyrighted work. The court rejected NBC's argument and found that Sonneborn possessed no duty to make such an inquiry. Here, the defendant did attempt to learn whether his actions in any way violated the law or tread upon anyone's rights.[3] As described earlier, he had numerous contacts with United States Customs. He registered the dolls with the appropriate Pennsylvania authorities. Finally, he attempted to contact Coleco, the plaintiff's exclusive licensee for distribution of the CPK dolls in the United States, to determine the propriety of his plan. While this attempt proved unsuccessful, and Reichert would have been wise to attempt to contact Coleco again, we believe his conduct is still significant indicia of the lack of "willfulness" on his part.

■ We reject, however, the defendant's contention that he should be treated as an "innocent" infringer. While we do not believe the defendant deliberately infringed the plaintiff's copyrights, we also do not believe that Reichert acted in complete ignorance of the fact that his conduct might somehow infringe upon the rights of another party. His attempts to contact Coleco, even after the completion of his numerous conversations with Customs Service personnel, amply demonstrate that such a question at some point existed in his mind. Finally, the dolls' packaging and the dolls themselves were clearly marked as being

**3.** Defendant's counsel made much of the argument that had the plaintiff registered its trademark and copyrights with United States Customs, it could have avoided the problem presented by this case since, according to defense counsel, the Customs Service would have informed Reichert that the European CPK dolls could not be imported into this country under the applicable laws and Customs Service regulations. Counsel for the defendant was apparently referring to § 526 of the Tariff Act of 1930, 19 U.S.C.A. § 1526 (West 1980), and the regulations promulgated thereunder. We find counsel's argument to be specious insofar as it seeks to place blame for the infringements upon the plaintiff itself. First, there is no evidence in the record that the plaintiff did or did not register its trademark and copyrights with United States Customs, Second, § 526 only authorizes the registration of *trademarks* with United States Customs. The defendant has not referred us to, nor has our research disclosed a comparable provision pertaining to copyrights. Further, under

Customs Service regulations in existence at the time the defendant communicated with the agency, United States Customs would not have restricted the importation of foreign-made goods bearing legitimate foreign trademarks if the owner of the American trademark had authorized the foreign entity to utilize the mark. *See Coalition to Preserve the Integrity of American Trademarks v. United States, supra,* and *Premier Dental Products v. Darby Dental Supply Co.,* 794 F.2d 850 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986). Finally, the defendant has cited no authority for the proposition that the owner of an American trademark who fails to register the mark with the Customs Service thereby waives his right to whatever other protections he might possess under the Lanham or Copyright Acts. Nevertheless, we still find Reichert's communications with the Customs Service to be relevant to the issue of his willfulness or innocence in infringing the plaintiff's copyrights.

copyrighted material. (See P-5 and 6). While we credit Reichert's testimony that he did not know that the importation of "authorized" foreign-made dolls could constitute copyright infringement, we believe the copyright notices should have spurred further investigation on his part.

■ Having concluded that the defendant's conduct was neither willful nor innocent, we are limited in our discretion to awarding the plaintiff statutory damages between $250 and $10,000 per infringement. In exercising such discretion in other copyright cases, fellow courts have examined a number of factors, among them: (1) expenses saved and profits reaped by the infringer; (2) revenues lost by the plaintiff; (3) the strong public interest in insuring the integrity of the copyright laws; and (4) whether the infringement was willful and knowing or innocent and accidental. *See Rodgers v. Eighty Four Lumber Co.*, 623 F.Supp. 887 (W.D.Pa. 1985); *Rare Blue Music, Inc. v. Guttadauro*, 616 F.Supp. 1528 (D.Mass.1985); and *Milene Music, Inc. v. Gotauco*, 551 F.Supp. 1288 (D.R.I.1982). As noted in *Milene Music, Inc. v. Gotauco*, however,

> In weighing these factors, most courts that have pondered the issue do not attach great weight to profits gained or to income lost, because these amounts are difficult to monetize, and may be marginal at best. (citation omitted). Courts thus have focused largely on the element of intent, and the per infringement award tends understandably to escalate, in direct proportion to the blameworthiness of the infringing conduct. (citation omitted).

551 F.Supp. at 1296.

■ The uncontradicted and unassailed testimony in this case was that the defend-

ant, while experiencing a gross profit of over $2,000,000, suffered a net loss of $17,-323.69 on the sale of the European CPK dolls. As to any profits lost by the plaintiff, it is clear that any such losses were minimal and, in fact, it is entirely possible that the defendant's activities resulted, ironically, in additional revenues that the plaintiff would not have recognized otherwise. As stated earlier, the European CPK dolls imported by the defendant were manufactured pursuant to a legitimate licensing agreement between the plaintiff and, for example, Jesmar. Thus, for each European CPK doll purchased by the defendant, the plaintiff received a royalty from the European manufacturer. This is not a case where the infringer's conduct resulted in the loss of licensing fees or royalties by the copyright owner.[4] Therefore, we are left to examine the factors of the public interest in insuring the integrity of the copyright laws and the defendant's intent in determining the statutory damages due the plaintiff. Applying these factors to the facts before us, we find that the defendant should not be assessed damages in excess of the statutory minimun. Once informed that his conduct constituted violations of the copyright laws, the defendant immediately ceased his infringing activities. We also find highly credible the defendant's testimony that he was entirely unfamiliar with the nuances of the Copyright Act. We note the defendant's efforts, though perhaps misdirected, to inquire as to the legality of his activity. We also note our belief that the plaintiff suffered little or no harm as a result of *this* defendant's conduct based on the record before us. Finally, we do not believe that an award of statutory damages in excess of $250 per infringement would in any way further the public interest. Based on these findings, we believe an award of $250 per infringe-

---

**4.** In response to the defendant's arguments on this point, the plaintiff argued that had Coleco filled the orders filled by the defendant, it would have received greater royalties because of the difference in the value of the American dollar and the European currencies. We find this contention to be true, but of minimal importance because the difference in royalties to the plaintiff would have been minor. Further, it is highly suspect that Coleco would have been capable of meeting the demand for the product in this country had the defendant not imported the dolls. The testimony presented at trial indicated that Coleco during the relevant period, while operating at its maximum capacity, could not fulfill consumer demand for the product. If so, the defendant by his conduct could very well have increased the royalties received by the plaintiff.

ment constitutes a wise exercise of our discretion.

### C. Costs and Attorney's Fees.

Pursuant to § 101 of the Copyright Act, 17 U.S.C.A. § 505 (West 1977), the plaintiff seeks to recover the costs and attorney's fees expended by it in prosecuting this action. Section 101 provides that:

In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C.A. § 505.

As stated by the Third Circuit Court of Appeals, "(t)he proper limits within which (a district court's) discretion must be exercised remain unclear despite more than three-quarters of a century experience with the statute". *Lieb v. Topstone Industries, Inc.*, 788 F.2d 151 (3d Cir.1986); *see also, Whelan Associates, Inc. v. Jaslow Dental Laboratory*, 609 F.Supp. 1325, 1329 (E.D. Pa.1985), *affirmed*, 797 F.2d 1222 (3d Cir. 1986) ("there is little case law to provide sure guidance as to the factors that should be considered in determining whether to award costs and attorney's fees"). Some courts have held that the party seeking such costs and counsel fees must demonstrate bad faith on the part of the opposing party. Other courts have held that an award of fees and costs is proper simply where the party seeking the award is the prevailing party and the fee sought is reasonable. *Id.*

The Third Circuit in *Lieb* specifically declined to impose any bad faith requirement as a prerequisite to such an award. The Court also stated "that the prevailing party should (not) be awarded attorney's fees in every case as a matter of course". 788 F.2d at 155. It thereupon proceeded to delineate a non-exclusive list of factors a court should consider in exercising its discretion to award fees and costs. Those factors are:

frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and *the need in particular circumstances to advance considerations of compensation* and deterrence.

*Id.* at 156. (Emphasis added).

Applying these factors to this case, it is clear that the plaintiff stands on high ground. The defendant without question infringed upon the plaintiff's copyrights. However, it is also clear that the defendant does not stand on low ground. He admitted liability, and agreed without hesitation to cease his infringing conduct. His defense of this action was limited solely to the issue of damages and it was meritorious as to the plaintiff's claim for actual damages and lost profits. Nevertheless, we do not believe that the scales are equally balanced between the plaintiff and the defendant. While not a willful infringer, neither was the defendant an innocent infringer. We also find relevant in this context the defendant's conduct of translating and copying the European CPK dolls' adoption papers and his attempt to pass the European CPK dolls off as genuine Coleco dolls. Finally, and most importantly, we believe that a failure to award the plaintiff costs and attorney's fees would negate the minimal amount of statutory damages we have awarded the plaintiff. As stated by the court in *Quinto v. Legal Times of Washington, Inc.*, 511 F.Supp. 579 (D.D.C. 1981),

An award of attorney's fees helps to ensure that all litigants have equal access to the courts to vindicate their statutory rights. It also prevents infringements from going unchallenged where the commercial value of the infringed work is small and there is no economic incentive to challenge an infringement through expensive litigation.

511 F.Supp. at 581.

We find that the case *sub judice* presents one of those instances where the need to advance the considerations of compensation requires us to award the plaintiff the costs and attorney's fees it incurred in prosecuting this action. An appropriate or-

der will be entered directing the plaintiff to file an affidavit and memorandum thoroughly detailing such costs and fees so that we may enter an appropriate award in its favor.[5]

## III. THE LANHAM TRADEMARK ACT VIOLATIONS.

As with the Copyright Act violations, the defendant did not contest the plaintiff's claim that his conduct constituted a violation of Section 43(a) of the Lanham Trademark Act of 1946, 15 U.S.C.A. § 1125(a) (West 1982). The permanent injunction agreed to by the parties prohibits the defendant from further violating the plaintiff's rights under the Lanham Act as well as under the Copyright Act, since it is the same, identical conduct that violated both statutes.

■ Regarding monetary damages, we find that the plaintiff is not entitled to any monetary relief pursuant to § 35 of the Lanham Act, 15 U.S.C.A. § 1117 (West Supp.1986), beyond that which we have awarded it for the defendant's infringement of its copyrights. We believe the award to the plaintiff of $1,000 for the four infringements constitutes just and adequate compensation for the defendant's infringement of the plaintiff's rights under the Lanham Act. As stated above, the defendant suffered a net loss from this scheme, and the plaintiff could prove no specific harm to its reputation flowing from *this* defendant's conduct.

Finally, we need not and do not address the issue of whether this matter presents an "exceptional case" justifying an award of attorney's fees to the plaintiff pursuant to § 35 of the Lanham Act, 15 U.S.C.A. § 1117(a) (West Supp.1986). *See, e.g., Standard Terry Mills, Inc. v. Shen Manufacturing Company,* 803 F.2d 778 (3d Cir. 1986). Any such award would be duplica-

tive of the award of attorney's fees we have already awarded the plaintiff under § 101 of the Copyright Act. The proofs necessary at trial to demonstrate infringement and damages under the Copyright and Lanham Acts were substantially identical. Whether the plaintiff had proceeded on only the Copyright Act violations or only the Lanham Act violations, it would have incurred the same amount of attorney's fees.

## IV. CONCLUSION.

In sum, we find the defendants, Joseph F. Reichert and J.F. Reichert, Inc., jointly and severally liable to the plaintiff in the sum of $1,000 for the four infringements of the plaintiff's copyrights. We also award the plaintiff the costs and attorney's fees it incurred in prosecuting this action.

The above shall constitute our Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52(a). An appropriate order follows.

### ORDER

AND NOW, this 13th day of March, 1987, for the reasons stated in the attached Memorandum, IT IS ORDERED that JUDGMENT IS ENTERED in favor of the plaintiff and against the defendants, jointly and severally, in the amount of One Thousand Dollars ($1,000.00).

IT IS FURTHER ORDERED that the plaintiff is awarded the costs and attorney's fees it incurred in prosecuting this action. The plaintiff is directed to submit an affidavit and memorandum detailing such costs and fees within fifteen (15) days of the date of this order. The defendants are directed to file, if they so desire, a response to said affidavit contesting the amount of counsel fees and costs detailed therein within fifteen (15) days of the plaintiff's filing of its affidavit with this Court.

---

5. We hasten to add that whatever amount the plaintiff eventually seeks to recover as costs and attorney's fees will remain subject to application of certain subjective considerations, such as the complexity of the litigation, the amount of statutory damages we have awarded the plaintiff, the culpability of the defendant's conduct, and so on. *See, e.g., Lieb v. Topstone Industries, Inc.,*

788 F.2d at 156; *NBC v. Sonneborn,* 630 F.Supp. at 541; *Rare Blue Music, Inc. v. Guttadauro,* 616 F.Supp. at 1531; *Blendingwell Music, Inc. v. Moor-Law,* 612 F.Supp. 474 (D.Del.1985); *M.S.R. Imports, Inc. v. R.E. Greenspan Co., Inc.,* 574 F.Supp. 31 (E.D.Pa.1983), *aff'd without op.,* 732 F.2d 146 (3d Cir.1984); and *Milene Music, Inc. v. Gotauco,* 551 F.Supp. at 1298.

IT IS FURTHER ORDERED that the defendants are PERMANENTLY ENJOINED from any further infringing conduct as prohibited by the Preliminary Injunction Order entered by this Court, by stipulation of the parties, on September 9, 1985.