Wesley M. WALKER, Jr., Plaintiff–Appellant,

v.

FORBES, INCORPORATED, Defendant–Appellee.

No. 93–1273.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1993.

Decided June 30, 1994.

---

**ARGUED:** Ralph Bailey, Jr., Ralph Bailey, P.A., Greenville, SC, for appellant. William Llewellyn Pope. Pope & Rodgers, Columbia, SC, for appellee. **ON BRIEF:** Tennyson Schad, Norwick & Schad, New York City, for appellee.

Before ERVIN, Chief Judge, MICHAEL, Circuit Judge, and SPROUSE, Senior Circuit Judge.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge MICHAEL and Senior Judge SPROUSE joined.

## OPINION

ERVIN, Chief Judge.

Wesley M. Walker, Jr. (Walker) brought this action against Forbes, Inc. (Forbes), publisher of *Forbes* magazine, alleging that Forbes infringed his copyright in a photograph by reproducing it in *Forbes* without his permission. The case was tried before a jury in the United States District Court for the District of South Carolina. The jury ruled for Walker, rejected Forbes' fair use defense, and awarded damages in the amount of $5,823. Unhappy with his victory prize, Walker moved for a new trial on damages alone, and the district court denied the motion. Walker now appeals, alleging that certain testimony was improperly admitted and that the judge erred in not giving two jury instructions he requested. For the reasons stated below, we affirm.

### I.

Walker lives and works in Greenville, South Carolina. Early in 1989, the *Greenville Piedmont* newspaper published a story on textile machinery magnate John D. Hollingsworth, Jr., whose plant and residence are located in Greenville. Accompanying the sto-

ry, titled "Greenville's invisible textile giant," was a current photograph of Hollingsworth that Walker had taken. The photograph depicted Hollingsworth, in plaid shirt and work pants, standing in front of one of the carding machines that his company produces and that have made him a very wealthy man. Below the picture, in the far right corner, the text "—(c) Wes Walker" appeared.

*Forbes* is a bi-weekly, nationally distributed magazine that covers various aspects of the business and financial worlds. In each year since 1982, Forbes has published a highly successful issue known as the *Forbes 400*. By 1989, the *Forbes 400* had been spun off as a special issue of the magazine that included brief profiles of each of the 400 wealthiest people and families in the United States, as well as related longer articles. The 1989 issue, which ran 408 pages (excluding covers but including advertising), included extended profiles of seven individuals. The first of the seven articles, titled "American Gothic," profiled Hollingsworth. The article, which paints an interesting portrait of Hollingsworth as an eccentric, occupies five pages. The cover of the magazine trumpets "The Eighth Annual Forbes 400" and "The Richest People in America." The cover also has leads for five articles that appear in the issue, but the Hollingsworth article is not included among those mentioned.

One ninth of the second page of the Hollingsworth article was devoted to a current picture of Hollingsworth—a cropped version of Walker's photograph from the *Greenville Piedmont* article. Unfortunately for Forbes, it did not obtain Walker's permission prior to reproducing his photo. Thus, after the issue was released and the matter came to his attention, Walker registered his copyright in the photograph and brought this action against Forbes for copyright infringement.

At trial, the parties stipulated to Forbes' revenue attributable to the publication of the 1989 issue of the *Forbes 400*. It was divided into categories for advertising revenue, subscriber sales and newsstand sales, and revealed the following:

| Revenue Source | Amount ($) |
| --- | --- |
| Advertising | 5,711,807.00 |
| Subscriber sales | 887,177.25 |
| Newsstand sales | 195,316.98 |
| Total | 6,794,301.23 |

Each party devoted a significant portion of the trial to introducing testimony to assist the jury, assuming it found Forbes liable for infringement, in determining how to divide this pie and award Walker his deserved slice. It is with Forbes' efforts on this point that Walker alleges fault.

Forbes introduced testimony from the current and most recent former managing editors of *Forbes*. Both testified that the article easily could have run without the inclusion of the Walker photo, and that a number of the other photos that tied into the eccentricities reported in the article were more valuable illustrations. They also indicated that the standard payment for a photo covering one-ninth of a page was $100. More importantly for present purposes, both testified that advertising is bought far in advance of publication or even assembly of the contents of an issue, and that a Chinese wall exists between the advertising and editorial sides of the magazine, so that, while advertisers knew that the issue would include the "Forbes 400" list and a number of related articles, they did not know who would be on the list or the contents, either visual or textual, of the articles in the issue. They also testified that a subscription to *Forbes* took 4–6 weeks for delivery of the first issue, and that no new subscriber could have seen the *Forbes 400* issue, sent in her subscription form, and subsequently received that issue as her first issue.

## II.

Walker's principal contention on appeal is that the district court erred in admitting this testimony concerning the derivation of advertising and subscription revenue because it allowed the jury to impermissibly "sever" categories of revenue in determining the proper amount of damages to award Walker. According to Walker, while Forbes could introduce evidence of various expenses, such as overhead, publishing costs, writers'

fees, etc., that it could deduct from the gross revenue total, the law does not allow the fact-finder to sever whole categories of revenue in determining appropriate damages.

The damages provision of the Copyright Act of 1976 provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). As the statute indicates, an injured party is awarded not only an amount to compensate for the injury that results from the infringement, but also the amount of the infringer's profit that is found to derive from the infringement, avoiding double counting. The reasoning behind this approach to damages is clear: it makes the infringer realize that it is cheaper to buy than to steal. A basic tort theory of damages, awarding only the plaintiff's injury, would allow for cases of "efficient infringement," i.e., situations where the profit exceeded the licensing fee, leaving infringers indifferent as to whether they paid up front or paid in court. By stripping the infringer not only of the licensing fee but also of the profit generated as a result of the use of the infringed item, the law makes clear that there is no gain to be made from taking someone else's intellectual property without their consent.[1]

Put simply, the damages awarded under § 504(b) can be stated as plaintiff's loss plus defendant's gain. The simplicity masks fiendish difficulties concerning the calculation of those two amounts, however; and given the remarkable breadth of works eligible for copyright protection, and the numerosity of

variables involved in determining loss and gain under each scenario, the experience of copyright damages has been one of case-by-case assessment of the factors involved, rather than application of hard and fast rules.

In establishing the infringer's gain, the assessment in every case must be guided by the rule that the statute awards the plaintiff only the "profits of the infringer *that are attributable to the infringement.*" 17 U.S.C. § 504(b) (emphasis supplied). This is a rule of causation, and

> it is necessary to attribute profits directly to the infringement, which in turn requires that the damages be direct rather than remote, and that an appropriate apportionment be made between revenue attributable to infringement and other revenue....

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03 (1993) (footnotes omitted); *see also Konor Enterprises, Inc. v. Eagle Publications, Inc.,* 878 F.2d 138, 140 (4th Cir.1989).

In this instance, we believe that the district court did not abuse its discretion in allowing Forbes to introduce testimony regarding the derivation of the advertising and subscription sales revenue related to the *Forbes 400* issue of the magazine. The testimony of the *Forbes* editors clearly disclosed that most advertising for a magazine's issue is set far in advance, and that no advertiser was informed of the content of the issue, beyond their general knowledge that this was a special issue devoted to the Forbes 400 list. The testimony at trial also revealed that many advertisers were not single-issue advertisers but rather placed advertisements repeatedly. In addition, the jury learned that it was factually impossible, because of the lead times built into the subscription system, to see a copy of the magazine on the stand, subscribe immediately as a favorable reaction, and then receive that issue as part of the subscription.

All of this testimony would be helpful to a fact finder whose responsibility is to appor-

---

1. We ignore the complexity that transaction costs add to this equation. Suffice it to say that, whatever the search and negotiation costs attendant to procuring a license, the transaction costs of stealing (i.e., attorneys' fees for lawsuits, including shifted fees for losing) almost always will be greater, reinforcing the fact that it is cheaper to negotiate than appropriate.

tion revenue, and profit, between infringing and non-infringing factors. As a general rule, advertisers do not place their ads on the basis of a particular article. Instead, companies place their advertisements because of the particular readership profile of a magazine, the magazine's general reputation, and the image that the advertiser wants to convey. This explains not only the choice of placement, but also the fact that many companies buy space regularly. *See generally,* J. Paul Peter & James H. Donnelly, Jr., *A Preface to Marketing Management* 133–55 (5th ed.1991). Similarly, while some people take subscriptions based on a single article, many do so as the result of reputation and repeated experience. Thus, the revenue that is derived from advance placement advertising and subscriptions can be attributed not to the use of a particular photograph in a particular issue of the magazine, unseen by advertiser or subscriber alike at the time they committed their money to the publisher, but rather to more generalized institutional characteristics, such as the history and reputation of the magazine itself.[2]

At least two other courts have similarly recognized the difficulties inherent in the calculation of revenue and profit attributable to the infringement in instances where the revenue stream is complex or the apportionment difficult because of the strength of other factors as engines of revenue and profit. In *Sheldon v. Metro–Goldwyn Pictures Corp.,* 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940), the Supreme Court addressed the apportionment of profit where the movie "Letty Lynton" infringed upon plaintiff's play, "Dishonored Lady." Disagreeing with

the court of appeals, the Court found that in performing the apportionment it was proper to take into account the popularity and drawing power of the motion picture's stars. *Id.* at 407, 60 S.Ct. at 687. It noted in particular the dissimilarity between the name of the play and of the movie, and that the picture had been licensed to its distributors in advance simply on the name of the film's star. *Id.*

Similarly, in *Rogers v. Koons,* 960 F.2d 301 (2d Cir.1992), the court addressed the apportionment of profits involving Jeff Koons' use, in his "String of Puppies" sculpture, of a copyrighted photograph of artist-photographer Art Rogers. In reviewing the apportionment performed by the district court, the Second Circuit noted that under the statute, Koons was not liable for the elements of profit attributable to factors other than his infringement of Rogers' work, and that "Koons' own notoriety and his related ability to command high prices for his work" were proper factors to consider in making such a determination. *Id.* at 313. Thus, "[t]o the extent that Koons is able to prove that the profits at issue derive solely from his own position in the art world, he should be allowed to retain them." *Id.*

It was thus entirely appropriate for the court to allow testimony providing information regarding the placement of advertising.[3] In determining what amount of Forbes' profit to attribute to the inclusion of the infringing item in its *Forbes 400* issue, it would be very helpful for the fact finder to know what amounts of revenue were committed to the issue sight unseen.[4] Similarly, the managing

---

**2.** This stands in sharp contrast with the experience of newsstand sales, where purchasers regularly peruse the contents of magazines before purchasing them; in this situation, it is much easier to say that some sales can be attributed to the infringement.

We reiterate that each case must be decided on its own set of facts, and that this case sets no rule to be inflexibly applied across categories of works. The differences in the way different copyrighted works can be infringed, and the way that those infringing items derive their revenue, makes the imposition of a rule impossible. In each case, the fact finder must simply do its best, keeping in mind the strictures of the law, to grapple with the particular set of facts and deter-

mine what profits can be attributed to the infringement.

**3.** In addition, we reject Walker's contention that the court abused its discretion in allowing this evidence because neither witness was an accountant or a financial expert. Their testimony was general in nature, and apparently within their personal knowledge as managing editors of the magazine.

**4.** Although Walker consistently refers to Forbes' action in introducing this information as an attempt to "sever" this revenue from the newsstand sales revenue, the district court refused a request from Forbes to so direct the jury. The question before this court is thus *not* whether, as

editors' testimony regarding subscription lead times also was properly allowed. In determining what amount of revenue was derived from this particular issue of the magazine, and how to apportion the profit from the issue, it could only aid the fact finder in knowing that none of the amount of subscription revenue listed was derived from people who had seen the magazine at the time they sent their money to subscribe.[5]

### III.

■ Walker also appeals from the refusal of the district court to give two proposed jury instructions. Walker does not allege that the instructions given misstated the law, but rather that his proposed instructions would have been better. We review the district court's formulation of jury instructions for abuse of discretion. *Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 890 (4th Cir.1992); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.1986).

### A.

■ In the proposed jury instructions that Walker submitted to the court, he included as part of the apportionment of profits section the instruction, "[A]ny error or doubt in your mind about the apportionment must be resolved in favor of the Plaintiff, Wesley M. Walker, Jr." The district court elected not to include this language in the instructions actually given.[6]

It is uncontroverted that "[i]n performing the apportionment, the benefit of the doubt must always be given to the plaintiff, not the defendant." *Frank Music Corp. v. Metro-*

*Goldwyn–Mayer Inc.*, 886 F.2d 1545, 1549 (9th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 496 (1990). Although the district court refused to give the separate jury instruction requested by Walker, it did instruct the jury on this matter:

> Since the amount of Forbes' gross revenue is established, the burden then shifts to Forbes to prove by the preponderance or greater weight of the evidence the elements of profit attributable to factors other than the copyrighted work. It is not required that Forbes prove these elements to a mathematical exactness. They must only prove them to a reasonable approximation. *Amounts or elements of profits should be deemed attributable to the alleged infringement unless Forbes proves by a preponderance of the evidence that they are not.*

(Emphasis supplied). This instruction correctly stated the law concerning the shifted burden of proof that the defendant bears to show the portion of revenues and profits that are not attributable to the infringement, and, in the emphasized language, explained the impact of this shifted burden upon the apportionment calculation. The difference between the language of Walker's proposed instruction and the instruction actually given is small. Because the judge properly instructed the jury as to the law, and the rejected instruction dealt with an issue adequately encompassed by the given instruction, we do not believe that the judge abused his discretion.

### B.

■ Walker also requested that the jury be instructed that "[t]he purpose behind

---

a matter of law, it would be proper to exclude such information from consideration in determining the proper apportionment; we deal here with the submission, not suppression, of information to the fact finder, and we express no opinion on the question not before us today.

**5.** This case does not require us to address questions regarding future revenue that Forbes received as a result of the use of the Walker photograph. Certainly it is true that "any profits of the infringer that are attributable to the infringement" under § 504(b) in the abstract will include not only profits from sales of the infringing item, at issue here, but also future revenue the publisher derives from the infringement. While it may be that some future advertisers or purchasers

(through either subscriptions or newsstands) are moved to act as a result of the favorable impression that they receive from their viewing of the infringed item within the infringing work, Walker does not attempt to pursue this route to recovery, conceding the proof difficulty that such a calculation faces under the causation analysis of § 504(b).

**6.** At the hearing on the motion for a new trial, the judge indicated that he thought that the instructions concerning calculation of damages were adequate and that the jury properly resolved any doubt in favor of the plaintiff, noting that "[t]he jury verdict was within a few hundred dollars of what I personally would have given had I been the one making the decision."

awarding the infringer's profits to a copyright owner is to discourage copyright infringement." Walker believes that the absence of this instruction explains the small sum awarded. He notes that "[t]he refusal to give the requested instruction resulted in confusion of the jury, which could not possibly have made the correct inquiry, having been blind to the statutory purpose." Opening Brief of Appellant at 32. He further notes:

> Had the jury been instructed that the purpose of awarding profits under § 504(b) is to discourage copyright infringement, the jury would more likely have awarded profits in furtherance of that purpose. Clearly, no publisher would be discouraged from infringing if all it had to disgorge was $5,823, which in this case represents less than a *tenth of one percent* of the total gross revenue of the infringing work.

*Id.* at 32–33 (emphasis in original).

█ Walker's argument explains precisely why the district court wisely decided not to include the broad instruction requested. As stated above, the profits a plaintiff receives under the Copyright Act are those attributable to the use of the infringed work. Their award is designed to remove from the defendant all benefit derived from the misappropriation of the plaintiff's intellectual property. This damages structure is not designed, as plaintiff's language suggests, to be punitive. If, as here, the infringement occurs as a small part of a much larger work, the fact finder properly focuses not on the profit of the work overall, but only on the profit that the infringement contributes. This allows the plaintiff to recover a windfall (in the form of defendant's profit from the infringement over and above the loss to the plaintiff), while the defendant is stripped of all benefit that flows from its wrongdoing. But, as the Supreme Court has stated quite clearly, "[t]he purpose is thus to provide just compensation for the wrong, not to impose a penalty by giving to the copyright proprietor profits which are not attributable to the infringement." *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 399, 60 S.Ct. 681, 684, 84 L.Ed. 825 (1940). While Forbes made substantial sums from this issue, if only a small part of that amount can be attributed to the use of Mr. Walker's photo, as the jury here decided, then only a small part is his reward. The Copyright Act draws the line between under- and overdeterrence by establishing the damages provided. If the fact finder is properly instructed in the law to apply, complaints of underdeterrence from the application of the law must be directed elsewhere.[7]

At trial, the district court gave ample instructions to the jury concerning the calculation of damages in the form of profits:

> The copyright owner is entitled to recover *any profits of the infringer that are attributable to the infringement....* And the infringer is required to prove his elements of profit attributable to factors other than the copyrighted work.

> \* \* \* \* \* \*

> Amounts or elements of profits should be deemed attributable to the alleged infringement, unless Forbes proves by a preponderance of the evidence that they are not. To the extent Forbes is able to prove that the profits at issue derive solely from their own work, exclusive of the effect of the Hollingsworth picture, they are permitted to retain them. Damages need not be measured by the entire profit earned by Forbes on the issue, but should be in an amount commensurate with the value of the alleged infringing material in relation to the issue as a whole. You must therefore seek to calculate the profits received by Forbes from its publication of the Hollingsworth picture in relation to the profits

---

7. We note in passing that a claim of underdeterrence in *any particular case* is difficult to press. By stripping all profit from the infringer, it creates an incentive to license, since the infringer has lost the benefit presumably desired from the infringement in the first place. On the other hand, assuming that not every copyright infringement is discovered, and that some willful infringement occurs based on a cost-benefit analysis that includes this "non-discoverability probability" in its calculus, underdeterrence in an aggregate sense may be present because, while it may not be cheaper to steal than buy in any particular case, since some cases will not be discovered, the life of crime may be a better deal overall. Of course, examination and evaluation of such difficulties is exactly the province of Congressional expertise.

received from the issue as a whole. To do so, you should consider the contribution, if any, that publication of the Hollingsworth picture made to the profits from the issue.

In other words, keeping in mind the burden of proof and the law on damages as I have given it to you, you must determine on the question of damages *what profit on this issue is attributable to the Hollingsworth picture. The purpose of the law regarding compensation for damages, which I have explained, is to provide just compensation for the wrong, not to impose a penalty by giving to the copyright owner the profits which are not attributable to the infringement.*

(Emphasis supplied.) The district court's rich and detailed instructions did an excellent job of explaining to the jury its task in determining the correct apportionment of profit attributable to the infringement, faithfully explaining the rules and procedures set out in the statute. In so doing, they provided far greater guidance to the jury than the "purpose" instruction Walker requested, and avoided the danger that the jury would misconstrue its responsibility by imposing punitive sanctions that are not authorized by the statute. Having been properly instructed, there is no indication that the jury did anything other than follow those instructions.

### IV.

For the reasons set forth herein, we affirm the district court.

*AFFIRMED.*