**RICHMOND HOMES MANAGEMENT, INC., Plaintiff,**

v.

**RAINTREE, INC., Sunset Investments, Inc., and Jared R. Lake, Defendants.**

Civ. A. No. 93–0047–C.

United States District Court, W.D. Virginia, Charlottesville Division.

Sept. 7, 1994.

**1520**

W. Todd Benson, Thomas Ogburn Bondurant, Jr., Bondurant & Benson, Richmond, VA, for plaintiff.

George Howard Dygert, George H. Dygert & Associates, Sheldon H. Parker, Parker & Destefano, Charlottesville, VA, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL, District Judge.

The court tried this copyright infringement action on June 1–2, 1994. Prior to the trial, this court on March 9, 1994, entered a preliminary injunction prohibiting defendant Raintree, Inc. from constructing any residential home infringing on the copyrights of plaintiff Richmond Homes Management ("Richmond Homes") in their Louisa home ("Louisa"). The court found prima facie evidence that the plaintiff possessed a valid copyright, that defendant Raintree had access to the plaintiff's design and structure, and that the defendant's Rockford home ("Rockford") was substantially similar to the Louisa. These findings were partly based on the testimony of Hilton Rubin, who stated in depositions that he was given a copy of the Louisa to place in the defendant's computer, and the testimony of Richard McCormick, who stated that he believed he owned a Louisa when in fact he owned a Rockford. Sunset Investments, Inc. and Jared Lake ("Lake") were joined as defendants on April 6, 1994. The court will outline the facts of the case below, which will be further developed in the course of determining appropriate legal conclusions.

### I. Findings of Fact

#### A. Parties

The parties to this case are competitors in the Charlottesville housing market. Richmond Homes is a Virginia corporation in the business of land development and construction supervision, furnishing house plans and management services to a group of six "S" corporations engaged in real estate development in and around Charlottesville. The evidence does not disclose whether the plaintiff retains any ownership interest in these corporations. These corporations use plaintiff's house designs and provide fees to the plaintiff for the use of the designs, the amount of which was not established in the evidence. Robert Martinko oversees all construction activity for Richmond Homes.

Defendant Raintree is a Virginia corporation in the business of residential construction in the Central Virginia area surrounding Charlottesville, with its primary building activity in the Lake Monticello subdivision in Fluvanna County. Defendant Sunset Investments is a Virginia corporation principally in the business of purchasing lots for resale at Lake Monticello subdivision and in the surrounding area. Defendant Jared L. Lake is an individual who resides in Albemarle County, Virginia. He is the sole stockholder in Raintree and Sunset Investments. He has been at all times, and is presently, the sole director and President of Sunset Investments and the sole director and Secretary/Treasurer of Raintree. In 1992, he was also the President of Raintree.

#### B. Louisa and Heritage Copyrights

The plaintiff presented prima facie evidence of valid copyrights in the house plans, architectural work, and an architectural flyer of the Louisa, which were obtained in May 1992. The Louisa registrations were revised around August 1992 to clarify the fact that the Louisa is a derivative work based on plaintiff's prior design, the Heritage home ("Heritage"). Richmond Homes applied for and received a copyright registration for the

plans of the Heritage in 1987, which it continues to own. The defendants did not introduce evidence to rebut the validity of the Heritage copyrights.

The floor plans of the Heritage and Louisa are essentially the same, except for the fact that the Louisa contains forty to forty-eight additional square feet of floor space. The floor plans of the Heritage, incorporated into the Louisa, are not particularly unusual but are nonetheless original. The distinguishing feature of the floor plan in each case is the placement of the family room in the front of the house, normally the location of the formal room; also distinct are the arrangement and spacing of the various components of the interior layout. The defendants introduced no floor plans substantially similar to those plaintiff developed, except the floor plans of the Rockford.

Likewise, the exterior of the Louisa is the original creation of the plaintiff. Though the double-gabled roofs, windows, and other components used in the Louisa exterior are not original elements of house design, "what distinguishes houses one from another, is how they're put together." Testimony of Ann Collins. The Louisa exterior, like the interior, is derived from the plaintiff's Heritage. The exterior is significantly different from that of the Heritage, however. Whereas the Heritage has a peaked roof over the family room and a shed roof over the porch at the front door, the Louisa has a double-gabled roof over the family room and front porch. This change consisted of extending the roof from the peak of the house over the front door to the edge of the porch and adding a gable roof running over the other side of the porch, joining the long sloped roof from the peak of the house. Other changes from the Heritage were made in the front elevation of the Louisa to accommodate the change of roofline, including the elimination of one window, the installation of a second octagonal vent at the peak of the porch roof, and the removal of a small cantilever of the second floor. The double windows, the placement of the dual octagonal vents, and the differently sloping rooflines contribute to the Louisa's distinctive design.

Robert Martinko and V. Earl Dickenson of Richmond Homes developed both the Heritage and Louisa designs. Mr. Martinko testified that the genesis of the Louisa was a "change in philosophy," the idea being that diverse front facades should be created to accompany the preexisting floor plans in the company's inventory to expand consumer choice. Testimony of Robert Martinko. That the design is original is supported by the fact that none of the defendants' expert witnesses identified a home that could be confused with the Louisa, based on exterior appearance. *See* Testimony of Bruce Wardell.

### C. Similarity Between the Rockford and the Louisa

As previously noted, this court granted a preliminary injunction based in part on the statement of Richard McCormick that he believed he owned a Louisa home, when in fact he owned a Rockford. Gary Smith, another Raintree customer, testified to the similarity between the Rockford he purchased and the Louisa. Furthermore, plaintiff's expert witness, architect Ann Collins, testified that the Rockford and the Louisa could be attributed to the same author.

The exhibits submitted at trial show that all of the Rockford interiors, and all of the exteriors except one, are substantially similar to the Louisa. The family room is located in the same place, with virtually identical dimensions; door and window placements are substantially similar, as are the location and sizes of rooms and closets. On the exterior, to the untrained eye, the original McCormick home and the Louisa are identical. The defendants altered their Rockford designs somewhat in response to customer input, but nearly all of the subsequently constructed homes are substantially similar to the Louisa. Where certain Rockfords do not connect the front gables with a single sloping roofline, as the Louisa does, or in cases where side garages have been added, these are minor variations on the basic Louisa design. The similarities in the slope of the roof, the double windows on the front of the house, and the dual air vents continue to exist. The only Rockford exterior that is substantially differ-

ent from the Louisa is the Rockford built on Lot 14, Section 8 of Lake Monticello. The Rockford depicted in Raintree's advertisements is identical to the Louisa.

## D. Evidence of Copying

Though it is unclear from the evidence exactly when, or in what format, Raintree's former employee Hilton Rubin was given a depiction of the Louisa, Mr. Rubin testified that he was told to put a rendering of the Louisa on Raintree's computer at approximately the time when Raintree was negotiating with two customers interested in the Louisa design. Buttressing this evidence of copying is the testimony of plaintiff's expert Robert Kirchman, who showed how a Raintree depiction of the Rockford elevation was a "second generation" rendering, likely created by copying the Louisa.

Rubin's testimony, at the very least, supports the weight of the evidence that the defendants had access to the Louisa design. One Louisa had been constructed in the vicinity of Charlottesville prior to the Rockford's creation. Frank Brown, a realtor responsible for marketing plaintiff's houses in the Charlottesville area, distributed marketing brochures depicting the exterior and floor plans of the Louisa prior to June or July of 1992, including posting copies in open houses and mailing brochures to real estate agents selling substantial numbers of homes in the Charlottesville area. Furthermore, the witness Smith testified that he had been provided with a brochure depicting the Louisa prior to meeting with a Raintree sales agent and may have shown it to the agent. The witness McCormick had also been provided with a packet of information by Richmond Homes, which may have included a depiction of the Louisa, prior to negotiating with Raintree for the purchase of a house. Defendants' access to the plaintiff's brochures is supported by the testimony of defendant Jared Lake, who admitted that he obtained a copy of a Louisa brochure after he heard rumors of being sued.

Mr. Lake tried to counter the evidence of copying and access by introducing a supposedly free-hand sketch to prove his independent creation of the Rockford. This so-called sketch, however, was revealed at trial to be a tracing of a pre-existing Rockford floor plan. The sketch was a tracing of the Meyer floor plan, the last house Raintree built. No other credible evidence supports defendant Lake's testimony that he independently created any aspect of the basic Rockford design.

## E. Damages

Richmond Homes's accountant, Robert Tappen, testified that the plaintiff realized a profit of $20,908 per home of the Louisa style. Mr. Tappen, however, also testified that the only income the plaintiff receives from the sale of its homes by independent realtors is a management fee. The amount of this fee in relation to the profit on each sale was not established. Moreover, Richmond Homes produced no evidence establishing how many homes it would have sold but for the sales of the fourteen Rockfords.

The evidence established that the first ten Rockfords sold at a price range between $101,000 and $134,000. Raintree's total sales on the first ten houses were $1.17 million and total costs were $1.10 million, for a net profit margin of 5.9%. Defs.' Evid. Docs., Tab 30, Testimony of Preston Morris. This profit margin is greater than the 3.73% figure provided by the defendants in their itemized cost accounting of one Rockford house, based on a sales price of $97,900. Defs.' Evid. Docs., Tab 23. Whereas the higher figure is what the defendants "did obtain" on the sale of the first ten Rockfords, Defs.' Prop. F. of Fact and C. of Law at 34, Testimony of Preston Morris, the lower figure is based on projected costs.

It appears from the evidence that the defendants factored in Raintree's total fixed overhead in calculating projected profit based on their itemized list of costs. Defs.' Evid. Docs., Tab 23. The figure they list for such overhead is 12%. There is no evidence to support attributing all of this fixed overhead to the construction of the Rockford, however. Moreover, there is no evidence that establishes the amount of fixed overhead factored into the higher 5.9% net profit figure related to the first 10 Rockford homes, since the 12% figure comes from the projected cost accounting for one Rockford home

that established the net profit at 3.73%. Defs.' Evid Doc, Tab 23. Since the 12% overhead figure—or its proportionate part—is the only one available to the court, the court will consider it equally applicable to all the Rockfords constructed, including the first ten, the profits of which are based on actual figures, and the last four, the profits of which have been calculated based on projected itemized costs.

There is no evidence, however, showing that the full 12% of general fixed overhead can properly be attributed to the construction and sale of Rockford homes alone. Defendant Lake testified that Raintree builds approximately twenty-five homes per year. Fourteen Rockfords were built in two years, averaging seven Rockfords per year. These seven Rockford homes thus account for 28% of Raintree's building activity in each year. Accordingly, the court finds that 28% of the 12% figure listed as general overhead is attributable to the Rockford, or 3.36%. The difference between this amount, 3.36%, and the 12% figure Raintree listed, or 8.64%, is not attributable to the construction of the Rockford.

## II. Conclusions of Law

### A. Copyright Validity

■ To establish copyright infringement, a copyright holder must first pass the threshold of establishing copyright validity. *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065 (4th Cir.1988). The court must address this threshold issue in light of the fact that although the plaintiff's valid copyright registrations create the presumption of copyright validity, *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d Cir. 1991), where the copyright is challenged the plaintiff bears the ultimate burden of proving the validity of the copyright. *Keeler Brass Co.*, 862 F.2d at 1065. The court therefore must first determine whether the plaintiff has satisfied its burden of proving that the plans and structure of the Louisa are subject to copyright protection before proceeding to the question of copying.

■ Architectural structures and plans are subject to copyright protection under 17 U.S.C. § 102(a)(5) and (8) where the author has independently created the works and the works reflect creativity, regardless of how simple the design. *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F.Supp. 1228, 1231–32 (D.N.J.1992) (citing *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 344, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358 (1991)). If a house design is sufficiently original, copyright protection is not precluded because the design is also utilitarian. Architectural works are by definition at least partly designed to serve a "useful function." *See Value Group, Inc.*, 800 F.Supp. at 1232 n. 6 (citing *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (where object embodies originality, copyright protection will not be displaced by fact that design was embodied in "useful article")).

The level of originality required for copyright protection is not high. *Feist*, 499 U.S. at 344, 111 S.Ct. at 1287; *see also Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876, 880 (9th Cir.1992) (draftsman need not contribute any novelty to architectural plans for copyright protection) (citations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 605, 121 L.Ed.2d 541 (1992). Rather, a work need only exhibit a "minimal degree of creativity." *Feist*, 499 U.S. at 345, 111 S.Ct. at 1287. " '[A]ll that is needed to satisfy [the originality requirement under] both the Constitution and the statute is that the author contributed something more than a merely trivial variation, something recognizably his own. Originality in this context means little more than a prohibition of actual copying.' " *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 438 (4th Cir.1986) (quoting *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir.1951)).

■ Although the underlying unoriginal component parts of a creation are not subject to protection, a creator's choice of selection and arrangement of these parts, where independently made, may be original and therefore copyrightable. *Andrews*, 783 F.2d at 438; *see also* 17 U.S.C. § 101 (defining architectural work as including "the arrangement and composition of spaces and elements in the design"). Moreover, just as compilations of facts may be copyrighted, *Andrews*, 783

F.2d at 438, original creations that are derived from preexisting works are also subject to copyright protection as "derivative works." 17 U.S.C. § 101. The court looks to the new material added to the underlying elements in the derivative work to resolve the question of originality. *Andrews*, 783 F.2d at 438. In line with the aforementioned principles, a derivative work will be deemed sufficiently original if it has a " 'faint trace of originality' and if it provides a 'distinguishable variation' " from the original material. *Id.* (citations omitted).

■ The Louisa is a "distinguishable variation," *id.*, of the Heritage and other homes presented in the evidence and embodies more than that "faint trace of originality," *id.*, sufficient for the plaintiff to claim the work as "distinctly his own," *id.* Though, like all modern mass-produced homes, the Louisa is comprised of standard features, the way these features are arranged is "what distinguishes houses one from another...." Testimony of Ann Collins. The Louisa home was the independent product of Mr. Martinko's idea to create diverse front facades to go along with preexisting floor plans, and the resulting design is different from its predecessor, the Heritage. Most notably, the Louisa is different from every home the defendants proffer to prove its unoriginality. The defendant's expert made vague statements that the house is generic and similar to many others in the Charlottesville area, and that the double-gabled roof design is a standard feature in American architecture, but when pressed could identify not a single house that could be confused with the Louisa.

This conclusion is consistent with the purpose of the Architectural Works Copyright Protection Act of 1990, Pub.L. No. 101–650, 104 Stat. 5089, 5133–34 (1990), to strengthen copyright protection of architectural structures. Before the Act brought the United States into compliance with the Berne Convention on the Protection of Literary and Artistic Works, courts generally ruled that, while it may be a violation of copyright law to copy architectural *plans* and *drawings* since these are graphic and pictorial works covered under 17 U.S.C. § 102, there is no prohibition against copying *architectural structures.*

This court ruled that copying a house structure, without copying the plans, did not constitute copyright infringement under the rule of *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1880). *Acorn Structures, Inc. v. Swantz*, 657 F.Supp. 70, 75 (W.D.Va.1987). Prior to the 1990 amendments, architectural structures were only protected insofar as they could "qualify as a work of art or conceivably as a reproduction of a work of art." *Fotomat Corp. v. Photo Drive–Thru, Inc.*, 425 F.Supp. 693, 707 (D.N.J.1977). Examples include the Statute of Liberty or the Eiffel Tower.

While some courts attempted to make up for the insufficient protection of architectural structures by calculating damages on the basis of the profits realized from the illegal construction of works depicted in copyrighted plans, other courts ruled that under pre–1990 copyright law, the architect had no exclusive right to build structures depicted in technical writings. *Compare Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274 (6th Cir. 1988) (calculating damages from copied plans on basis of infringer's profits on house sales) *with DeSilva Const. Corp. v. Herrald*, 213 F.Supp. 184, 195 (M.D.Fla.1962) (referring to the "unanimous view of text writers [that] the architect does not have the exclusive right to build structures embodied in his technical writings"); *see also* Jonathan M. Purver, *Copyright, Under Federal Copyright Laws, of Architectural Plans, Drawings, or Designs*, 3 A.L.R.Fed. 793 (1970 & Supp. 1993).

Prior to the 1990 amendments architectural works existed in an intellectual property limbo. "Because their work [could] rarely, if ever, satisfy the more rigorous novelty standard applied to patent applications, architects generally look[ed] to copyright law for protection of their creative works." *Nino Homes*, 858 F.2d at 278. The utilitarian exception to copyright law contained in 17 U.S.C. § 113(b) limited the protection of architectural structures, and humble architectural achievements, such as the Louisa, were left with the minimal protection extended to copyrighted plans and drawings. *See* H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 55 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5668 (purely nonfunctional structures

fully protected under 1976 Act, but where only elements of shape in architectural design are inseparable from utilitarian aspects of structure, copyright protection of design is unavailable).

By extending copyright protection to architectural structures in 17 U.S.C. § 102(a)(8), the Architectural Works Copyright Protection Act brought architectural structures within the confines of existing copyright standards for creative works. Thus, architectural works need no longer serve primarily nonfunctional, creative purposes, akin to sculptures, but protection extends to the most mundane, functional products of modern commercial architecture so long as the minimal originality requirement of copyright law is met. *See Value Group, Inc.*, 800 F.Supp. at 1232 n. 6. Now structures, as well as plans, are subject to the same copyright protection. Moreover, structures and plans, such as those of the Louisa, may be protected irrespective of their functional purpose. The defendants' argument that the functional aspects of the Louisa invalidate the copyright in its structure, and that the defendants therefore did not infringe on any of plaintiff's copyrights by building substantially similar homes, contradicts the shift in treatment of architectural works brought about by the 1990 amendments to the Copyright Act.

■ The defendants further argue that, if the Louisa is protected at all, it is only protected insofar as it differs from the Heritage, upon which it is based. Since the exterior of the Louisa is significantly different from the Heritage, this aspect of the Louisa is clearly "distinguished from the preexisting material employed in the work," 17 U.S.C. § 103(b), and thus subject to full protection. The interior layout of the houses is a different matter, since the evidence establishes that the interior structures[1] and the graphic floor plans depicting the interior structures of the Heritage and Louisa are nearly identical. Since there is no evidence that the defendant copied the Heritage, the Louisa copyrights must protect the arrangement of the interior previously registered under copyrighted Heritage plans[2] for the plaintiff to establish infringement on this basis alone. This is the only way the plaintiffs can establish infringement in the case of the one Rockford—that built on Lot 14, Section 8 of Lake Monticello—out of the fourteen built by Raintree that has an exterior significantly different from the Louisa but has an interior layout identical to the Louisa's.

■ Where the same creator owns both the original and derivative copyrights, the only sound interpretation of the Copyright Act is that the derivative work carries forward all preexisting copyrights in the original work. *See Donald Frederick Evans v. Continental Homes, Inc.*, 785 F.2d 897, 904 (11th Cir.1986) (upholding validity of substantially similar architectural plans where one corporation owned both copyrights); *Rexnord, Inc. v. Modern Handling Systems, Inc.*, 379 F.Supp. 1190 (D.Del.1974); 2 M. Nimmer, *Nimmer on Copyright*, § 7.16[B][2]. In *Rexnord* the court held that "it would be consistent with the statutory scheme, as well as with the language of Section 3 [of the Copyright Act]" that a catalogue derived from other catalogues owned by the same author incorporates the prior copyrights. 379 F.Supp. at 1198. Under a contrary principle, the owner of a compilation or derivative work would have to allege and prove multiple copyright violations, depending upon the exact number of prior copyrights incorporated into a subsequent work. *See id.* Modifications of preexisting works by their owners could be discouraged by the prospect of losing copyright protection. As the owner of original copyrights creates derivative works, the opportunity to prove access to the original material may diminish as this material drops out of

---

1. "Interior structure" and "interior layout" as used here refer to the arrangement and placement, and the size, of rooms, halls and closets inside a house. These terms are used as opposed to "floor plans" to emphasize the distinction between graphic plans and structures, and the fact that infringement can be established on the basis of infringing either plans or structures.

2. At the time the plaintiff copyrighted the Heritage, structures were not generally subject to copyright protection. Accordingly, only the plaintiff's Heritage plans were copyrighted. *See* text at page 1524, *supra*.

circulation and becomes subsumed into the owner's derivative works. If the derivative work fails to protect the original material upon which it is based, an infringer could escape liability by proving a lack of access to the original material. This result would contravene the purpose of 17 U.S.C. § 106(2), which encourages the creation of derivative works by the owners of the original material by granting the owners of original works the exclusive right to creative derivatives therefrom.

■■■ Since the plaintiff owns the copyrights to both the Heritage and the Louisa, and the Heritage copyright is valid, the protection of the Heritage floor plans is carried forward into the Louisa copyright. The defendants' challenges to the validity of the Heritage copyright, in the effort to defeat incorporation, both fail. The defendants' first challenge, on grounds of publication without notice, fails in light of the Berne Convention Implementation Act of 1988.[3] Insofar as the defendants challenge the originality of the Heritage floor plans, the court finds that the plaintiff independently created the Heritage plans and the plans possess the minimal level of originality required for copyright protection. There is no requirement in copyright law that the plans be particularly unusual; they simply must be original. Mass-produced house floor plans are commonly protected. *See, e.g., Robert R. Jones Assoc., Inc. v. Nino Homes,* 686 F.Supp. 160 (E.D.Mich.1987), *modified on other grounds,* 858 F.2d 274 (6th Cir.1988) (infringement of house floor plans); *Value Group, Inc.,* 800 F.Supp. at 1232 (floor plans and general external appearance of house may be infringed). In this case, the arrangement of space, the placement of the family room, and the sizing of the rooms demonstrate that the plans were the original creation of Mr. Martinko. The defendants introduced no substantially similar plans to prove otherwise.

The court concludes that the plaintiff has satisfied its burden of proving that the plans as well as the structure of the Louisa are amendable to copyright protection, and, on the state of this record, that the underlying elements of the Louisa that were originally created by the plaintiff in the Heritage are protected in the plaintiff's Louisa copyrights. Accordingly, the plaintiff can establish copyright infringement by proving that the defendant copied either the plans or structure of the Louisa interior or exterior.

### B. Infringement

#### 1. Prima Facie Case

■■■ After the court makes the threshold determination of copyright validity, to prove infringement the plaintiff must establish that the defendant copied the protected work. *Keeler Brass Co. v. Continental Brass Co.,* 862 F.2d 1063, 1065 (4th Cir.1988). Since evidence of direct copying rarely exists, a copyright plaintiff may prove copying by evidence of access and substantial similarity. *Id.; Nino Homes,* 858 F.2d at 277.

##### a. Access

"[T]he copyright holder need not necessarily prove access on the part of the alleged infringer, so long as there is proof that the person who composed the allegedly-infringing work had access to the copyrighted material." *Nino Homes,* 858 F.2d at 277. There is some evidence of direct copying in this case and ample evidence to establish copying by circumstantial evidence of access and substantial similarity. As set out in the findings of fact, Hilton Rubin testified to putting a copy of the Louisa, and many other home designs, into Raintree's design computer, and Mr. Kirchman showed how the artist's rendering of the Rockford was a "second generation" rendering, likely created by copying, erasing, and slightly altering that of the Louisa. In addition, there is evidence that the defendants had access to the plaintiff's fliers and house design. For instance, Mr. Lake admitted to having a copy of one of plaintiff's brochures in his office. On these findings,

---

**3.** Pub.L. No. 100–568, 102 Stat. 2853 (1988). The Act did away with the requirement that copyrighted works be published with notice. Section 7, 102 Stat. at 2857–58. Under the current statutory scheme, notice only serves to preclude the defense of innocent infringement. 17 U.S.C. § 401(d) (West 1988 & Supp.1994). Causes of action arising after the March 1, 1989, effective date of the 1988 amendments are governed thereunder. Section 13, 102 Stat. at 2861.

the court concludes that the defendant had access to the copyrighted work.

### b. Substantial Similarity

Having established access, the court must next consider the issue of substantial similarity. The test for substantial similarity, as formulated by Judge Learned Hand, is whether an ordinary observer comparing two works, "unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). "This evaluation should be based on the ordinary and reasonable layperson's overall impression of the two works, not on a detailed comparison of the two works, focusing on individual differences." *Ganz Bros. Toys v. Midwest Importers*, 834 F.Supp. 896, 901 (E.D.Va.1993).

The similarity between the first Rockford and the Louisa is clear. Plaintiff's expert witness testified that she would consider the Louisa and the Rockford to be products of the same author. None of the defendant's experts questioned this judgment. Also, Raintree's customer Mr. Smith stated that he regarded the Louisa and the Rockford to be similar.

Only the Rockford built by Raintree on Lot 14, Section 8 of Lake Monticello is significantly different from the Louisa. Defs.' Evid. Docs., Tab 13–N. Based on exterior alone, the Lot 14 Rockford is not substantially similar to the Louisa, since the Rockford in question has a long front porch, no double-gabled roof, and a significantly different arrangement of front windows. The evidence shows, however, that all of the interiors of the defendants' Rockfords are substantially similar to the floor plans of the Louisa, covered under the Louisa copyrights.

The court has previously established that the Louisa copyright protects the floor plans previously protected under the Heritage registration. Infringement can be established on the basis of infringing either the floor plans or the exterior, or both. *See Nino*

*Homes*, 686 F.Supp. at 163; *Value Group, Inc.*, 800 F.Supp. at 1232. It is not necessary to prove that every element of the Louisa plans or structure was copied; it is sufficient to show that a substantial part was copied. *MacMillan Co. v. I.V.O.W. Corp.*, 495 F.Supp. 1134, 1146 (D.Vt.1980) (citing *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.*, 476 F.2d 386, 391 (8th Cir.1973); *Nikanov v. Simon and Schuster, Inc.*, 246 F.2d 501, 504 (2d Cir.1957)). Since there is ample evidence of access to the interior structure and floor plans of the Louisa, and the interior layouts of the Louisa and all the Rockfords are nearly identical except for minor differences in dimension, the plaintiff has established that the Lot 14 Rockford also infringes the Louisa copyright.

### 2. Defendant Lake's Claim of Independent Creation

 Once a plaintiff has discharged the initial burden of establishing a prima facie case of infringement, as Richmond Homes has done, "the defendant then must rebut the presumption to satisfy his burden of going forward." *Keeler Brass Co.*, 862 F.2d at 1065. This presumption may be rebutted by sufficient proof that the allegedly infringing work was created independently, and that any similarities are merely coincidental. *Id.* The ultimate burden of persuasion remains on the plaintiff to prove infringement, but the plaintiff may prevail on the strength of the presumption created by establishing a prima facie case if the defendant introduces insufficient evidence in rebuttal. *Id.* at 1066.

 The only evidence of original creation submitted to the court was a purportedly original sketch of a Rockford floor plan by Mr. Lake. At trial, this sketch was revealed to be a tracing of a preexisting Rockford floor plan. The only other evidence supporting Mr. Lake's testimony that he independently created the Rockford is the contradictory testimony of Mr. Lake's associate Richard Sachs.[4] Given the lack of corroborating

---

4. Mr. Sachs stated that he met with the McCormicks in May 1992 to prove that the Rockford was designed prior to June 1992, the date of the

Louisa copyrights. This testimony conflicts with his affidavit, stating that he met with the McCormicks in mid-June 1992. Moreover, Mr. Sachs

evidence to support Mr. Lake's testimony that he independently developed the Rockford, the defendants have not introduced sufficient evidence to rebut the plaintiff's prima facie case.

## C. Relief

Having determined that the defendants infringed on the Louisa copyright by building fourteen Rockford homes in the Lake Monticello subdivision, the court must determine the appropriate relief. The plaintiff asks for damages in the amount of $1,508,600, as well as costs and attorneys' fees.

### 1. Parties Liable

 To hold all three defendants liable for the infringing activity it is not necessary to pierce the corporate veil under principles of state law. "One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing activity of another, may be held liable as a 'contributory infringer.'" *Broadcast Music, Inc. v. Jeep Sales & Service Co.*, 747 F.Supp. 1190, 1194 n. 1 (E.D.Va.1990) (citations omitted). Mr. Lake is the sole stockholder in Raintree and Sunset Investments and the court finds that he directed the infringing activity. Accordingly, he can be held personally liable as a contributory infringer. Furthermore, Mr. Lake operated Sunset Investments to sell lots in the Lake Monticello subdivision, upon which the Rockfords were built. This corporation played a significant part in the sale of the infringing Rockford homes, and profited thereby. Therefore, Sunset Investments is liable as a contributory infringer. Raintree, of course, is liable as the primary infringer.

### 2. Damages

 The damages provision of the Copyright Act provides:

The copyright owner is entitled to recover the actual damages suffered by him or her as a result of infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The provision is premised on a theory of restitution and unjust enrichment, not punishment. *See Walker v. Forbes, Inc.*, No. 93–1273, slip op. at 11, 1994 WL 287173 (4th Cir. June 30, 1994) (damages structure not designed to be punitive) (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 399, 60 S.Ct. 681, 683, 84 L.Ed. 825 (1940)). Under this restitution scheme the plaintiff must prove its loss or the unjust profits of the infringer. This is "a rule of causation ... 'which in turn requires that the damages be direct rather than remote....'" *Walker*, No. 93–1273, slip op. at 5–6 (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 14.03 (1993)). Moreover, the plaintiff is entitled to actual damages plus any additional profits above actual damages realized by the infringer, avoiding double-counting. *Walker*, No. 93–1273, slip op. at 5. If the plaintiff cannot prove causation sufficient to establish actual damages, the plaintiff is nonetheless entitled to recover the profits of the infringer if the profits are established with sufficient evidence. *Id.*

 The plaintiff failed to introduce any evidence to establish that it would have sold a Louisa in place of each Rockford sold by Raintree. The only customer lured away from Richmond Homes by Raintree who testified at trial was Mr. Smith, and he stated that he preferred Raintree because he considered the quality of its houses to be superior to those of the plaintiff. The plaintiff did not establish that Mr. Smith would have bought a Louisa but for the infringement. No other evidence establishes the causation element required for recovery of damages based on the margin of profit on the sale of Louisas above that realized by the defendants on the sale of Rockfords.

---

testified that he saw floor plans of the Rockford in May 1992. This is one month prior to the date Mr. Lake stated that he designed the Rockford.

*See* Affidavit of Jared Lake at ¶ 2 (February 28, 1992).

The contractual arrangements between the plaintiff and Charlottesville realtors also complicate any award of actual damages, since Richmond Homes provides licenses to construct its homes to local Charlottesville realtors in return for a sales commission. Richmond Homes would not, therefore, realize the entire profit on each sale of a Louisa, and the plaintiff submitted no evidence regarding the amount of its commissions. Of course, these contractual arrangement do not preclude the plaintiff from recovering the infringer's profits attributable to infringement, since under the statute the amount the copyright owner would have recovered in actual damages is irrelevant to establishing damages based on the amount of the infringer's profits. 17 U.S.C. § 504(b).

Since the plaintiff has not established actual damages, damages must be determined based on the profits of the infringer. The plaintiff must only establish the infringer's gross revenue. 17 U.S.C. § 504(b); *Konor Enterprises, Inc. v. Eagle Publications, Inc.,* 878 F.2d 138, 140 (4th Cir.1989). Then the burden shifts to the defendants to establish costs and profits not attributable to infringement. *Id.* To preclude a recovery that is excessive, and therefore punitive, or a recovery that is too low, the court must exercise its careful judgment in arriving at a fair damages award in light of the incentives of each party to inflate or deflate their accounting of costs. *Cf. Sheldon,* 309 U.S. at 408, 60 S.Ct. at 688 (stating, in context of apportioning profits attributable to infringing and non-infringing activity, that "equity is concerned with making a fair apportionment so that neither party will have what justly belongs to the other").

The plaintiff asks for $1,508,600, the calculations based on the gross revenue of the first ten Rockfords sold and a projected sale price of $97,900 for the four Rockfords that closed after January 1, 1994. The plaintiff is not entitled to such an amount, since the defendants have documented the costs of constructing the Rockford, producing an accountant and providing itemized figures of their costs. Though the court finds that all the costs submitted by the defendants cannot be considered in arriving at net profits, the defendants' evidence is sufficient to remove any justification for awarding the plaintiff the entire gross revenue of the sales.

Defendants submitted actual prices and costs of the first ten Rockfords, which establish a net profit margin of 5.9%. Defendants also submitted an itemized projected list of expenses associated with the construction of the Rockford, which add up to a profit margin of 3.73% of gross sales, based on a $97,900 house price. Defs.' Evid. Docs., Tab 23. It appears from the data Raintree submitted, based on the high costs listed for general and administrative expenses, that their expense figures include fixed overhead not necessarily related to the construction of the Rockfords. Since the defendants submitted no evidence to support a determination that their entire fixed overhead (12% of net profits) was related to the promotion, construction and sale of the Rockford, the court cannot consider this entire figure as part of the defendants' costs. *Sammons v. Colonial Press,* 126 F.2d 341, 349 (1st Cir.1942) (burden on defendant to show that general expense or overhead assisted in production of infringement).

The court will apportion the fixed overhead attributable to the Rockford based on the number of Rockfords sold compared to Raintree's overall sales. Raintree sold twenty-five houses per year and sold fourteen Rockfords in two years. Sales of the Rockford therefore represent 28% of Raintree's yearly sales. On this basis, the court attributes 3.36% of Raintree's overall 12% overhead to the Rockford. The remaining 8.64% is overhead that cannot be associated with the Rockford and cannot be considered in calculating costs. *Id.* Accordingly, the court will add 8.64% to the 5.9% net profit margin on the first ten Rockfords constructed by Raintree, and will add 8.64% to the 3.73% profit margin the defendants submit they would obtain on a house sold for $97,900, the amount the court will use in calculating the profits on the last four homes Raintree sold. This results in a net profit on the sale of the first ten Rockfords of 14.54% and a net profit on the sale of the last four Rockfords of 12.37%. These figures appear reasonable in light of the evidence and the inherent uncer-

tainty of estimating profits when all parties have the incentive to inflate or deflate costs.

Since the defendants did not provide expert testimony or other evidence supporting the exclusion of any element of their net profits from damages—by proving, for example, that factors other than infringement led to the sales—as existed in *Sheldon,* 390 U.S. at 406–09, 60 S.Ct. at 687–88, and *Walker,* No. 93–1273, slip op. at 3–4, the court must award the plaintiff the defendants' entire net profits. *Konor,* 878 F.2d at 140. "It is plausible, absent proof to the contrary, that all profits were a direct result of [the defendants'] infringement of [the plaintiff's] copyright," *id.;* and since the defendants' revenue stream associated with the infringing activity is simple and thus precludes the necessity of apportioning profits derived from multiple profit centers, "this is a case where the statute must be strictly followed," *id.*

The evidence establishes that the first ten Rockfords sold for $1,171,023. Defs.' Evid. Docs., Tab 30. No evidence established the sale price of the remaining four Rockfords. In the absence of such evidence, the plaintiff suggests using the minimum price listed for the Rockford, $97,900. Pl.'s Prop. F. of Fact and C. of Law at 15. This produces total sales for the last four Rockfords of $391,600. Applying the 14.54% and 12.37% profit margins to the first ten Rockfords and the last four Rockfords, respectively, results in a total damages award of $218,708.

### 3. Fees and Costs

■ Attorneys' fees and costs may be awarded by the court "in its discretion." 17 U.S.C. § 505. The limit on the court's equitable power, reasonably exercised, is that it must subject defendants and plaintiffs to the same standard when deciding whether to award fees or costs. *Fogerty v. Fantasy,* —— U.S. ——, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994); *Cohen v. Virginia Elec. & Power Co.,* 788 F.2d 247 (4th Cir.1986), *aff'g* 617 F.Supp. 619 (E.D.Va.1985) (rejecting dual standard fee shifting formula). "There is no precise rule or formula for making these determinations." *Fogerty,* —— U.S. at ——, 114 S.Ct. at 1033 (citation omitted). In addition to other basic equity concerns, the court is guided by the following factors that may cut against a plaintiff's request for fees and costs in a copyright action: 1) the presence of a complex or novel issue of law that the defendants have litigated vigorously and in good faith; 2) the defendants' status as innocent infringers; 3) the plaintiffs' prosecution of the action in bad faith; and 4) the defendants' good faith attempt to avoid infringement. *National Broadcasting Co., Inc. v. Sonneborn,* 630 F.Supp. 524, 542 (D.Conn. 1985).

■ Since the court finds that this case presented many close issues of fact and a few novel issues of law litigated on both sides vigorously and in good faith, the first factor is present here. On the record here, the court does not find the defendants to be innocent infringers and there is no evidence to support a contention that the defendants attempted in good faith to avoid infringement. Defendant Lake's effort to reach a settlement with the plaintiff after Mr. Lake had infringed the Louisa copyright does not constitute a good faith effort to avoid infringement. As to the final factor to be considered, there is no evidence showing bad faith on the part of the plaintiff in prosecuting the action.

Weighing these factors, and finding the first factor to be fully satisfied, fees and costs will not be awarded.

### III. Conclusion

In accordance with this Opinion, the court will enter an Order requiring the defendants, jointly and severally, to pay damages to the plaintiff in the amount of *$218,708.* In addition, the court will permanently enjoin the defendants from infringing plaintiff's Louisa design. The court will not grant plaintiff fees and costs.

An appropriate Order shall this day issue.